

10 CV 3801

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CRP/EXTELL PARCEL I, L.P.,

        Plaintiff,

    v.

ANDREW M. CUOMO, in his capacity as THE
ATTORNEY GENERAL OF THE STATE OF NEW
YORK; STROOCK & STROOCK & LAVAN LLP; 3to4,
LLC; ARC CHINISH RE LLC; ATLANTIC NYC
INVESTMENTS LLC; PARKER BAGLEY and JULIE
BAKER; BINCUBE PARTNERS; BRSP REALTY, LLC;
CHRISTOPHER A. CHANG and MARIA WU; MARK
CHU and NANCY CHAN; ONA COLASANTE;
MELINDA EVERETT and GERARD MILLIGAN;
JESSICA FAIETA; MAX GILANI; BENJAMIN
GOLDSHLAGER; KENNETH GOODMAN and
ANDREA ECONOMOS; KENNETH GOODMAN and
LYDIA GOODMAN; LOLA GUSMAN; GARY
HUANG and EVELYN HUANG; JANICE HUFF-
DOWDY and WARREN DOWDY; GYOO GWAN KIM
and SU JIN KIM; KYUNG KIM and HENRY
MYUNGHWAN KIM; MELISSA KO and S. DOUGLAS
HAHN; GAIL S. LANDIS and R. VICTOR
BERNSTEIN; BENJAMIN W. LAU and JUDITH T.
LAU as trustee for the LAU FAMILY TRUST and
designated Subtrusts thereof; GREGORY LEE; SEUNG
MOH LEE; HALEY LIEBERMAN BINN; DIANE
LIEBERMAN and LISA GINSBURG; ALBERT L.
MARINO and BETH F. HINNEN; ALAN MEYERS and
EVELYN MEYERS; TREVOR MORAN; MARLA C.
MUNS and KIMBERLY MCNEESE; MITCHELL E.
NEWMAN; HYUN KYU PARK and DOJA SONG;
PHILIP and GLENNIS POLITZINER; SHIRLEY
ROMIG and NICHOLAS ROMIG; MICHAEL
SALERNO; PAULINE SHENDER and ALEX
SHENDER; EDWARD M. SOLOMON and BARBARA
SOLOMON; HAN SOON YOM; and PIL YOON and
YOUNG YOON,

        Defendants.

**COMPLAINT**

RECEIVED
MAY 10 2010
U.S.D.C. S.D.N.Y.
CASHIERS

## INTRODUCTION

1.      This case arises out of the Attorney General of the State of New York's

unconstitutional, legally erroneous, and otherwise arbitrary and capricious determinations to

release millions of dollars in down payments held in escrow for the benefit of the Plaintiff,

CRP/Extell Parcel I, L.P. ("CRP/Extell").

2.      On April 9, 2010, the Attorney General issued determinations ordering the return

of over $16 million in such down payments, held with respect to forty condominium units

purchased in a new luxury building on Manhattan's West Side, The Rushmore, which

CRP/Extell developed.  The down payments had been placed in escrow pursuant to agreements

for the purchase of units in the building (the "Purchase Agreements").

3.      The down payments provided security for CRP/Extell pending completion of

construction of The Rushmore, at which point purchasers would close on their respective units.

Each Purchase Agreement incorporates an offering plan dated August 11, 2006, as amended, that

CRP/Extell used for the building (the "Offering Plan").

4.      The Attorney General's determinations allow the purchasers to abrogate their

contractual commitments to close on their units, taking advantage of a significant downturn in

the economy in general and in the real-estate market in New York City in particular.

5.      The Offering Plan provides that the projected first year of condominium

operations was September 1, 2008, through August 31, 2009, and thus the projected date for the

first closing of title to a unit in the building was September 1, 2008.  The Offering Plan

repeatedly states that CRP/Extell cannot and does not guarantee that the first closing of title to a

unit in the condominium will take place by the projected first closing date set forth in the Plan.

6.      CRP/Extell further included in the 757-page Offering Plan two provisions that set outside dates for the first closing of title to a unit in the building, as required by the operative regulations for offering plans for newly constructed condominiums in New York State.  Under the regulations and Offering Plan, the date of the first closing of title has no relationship to when any particular unit will be completed or will close; there is no outside closing date specified with respect to any particular unit.

7.      The first, conditional provision guaranteed purchasers that if the first closing in the building did not take place within six months of the projected first closing date (that is, by March 1, 2009) and the projected budget for the building increased by 25%, then purchasers would have a fifteen-day right to rescind their Purchase Agreements and have their deposits refunded to them.  Both conditions had to be met for the purchasers to have a right to rescind.

8.      A second, unconditional provision guaranteed purchasers that the first closing in the building would take place within one year of the projected first closing date (that is, by September 1, 2009) or else they would have a fifteen-day right to rescind their Purchase Agreements.  The attorney drafting the Offering Plan mistakenly typed into that provision that the guaranteed outside first closing date was September 1, 2008, which was the same day as the projected first closing date, instead of September 1, 2009, which was one year after the projected commencement of operations date and reflects what is required by the regulations.  The date typed into the Offering Plan (September 1, 2008) is a typographical error that does not reflect the intent of the parties, yet the purchasers contend and the Attorney General has determined that CRP/Extell is stuck with that date.

9.     The first closing of title to a unit in The Rushmore took place on February 12, 2009, within six months of the projected first closing date and well within the twelve month-deadline included in such offering plans and required by the operative regulations.

10.     Yet more than five months after the projected commencement of operations date of September 1, 2008, a purchaser looking to avoid its obligations under its Purchase Agreement filed with the Attorney General an "Application for a Determination of the Disposition of Downpayments" seeking to exercise its alleged right to rescind and have its deposit refunded because the first closing of title did not take place by September 1, 2008.  Over the next year, as the downturn in the economy and real-estate market continued, thirty-nine other purchasers filed applications with the Attorney General seeking to rescind their Purchase Agreements and to have their deposits refunded.

11.     An attorney for many of the purchasers publicly admitted that they filed their applications with the motivation of "the chance to buy in at a lower price" and thus opportunistically get out from under their Purchase Agreements during the downturn.

12.     Under Article 23-A of the New York General Business Law and the regulations promulgated thereunder, the Attorney General is authorized to make "determinations" to resolve such disputes concerning down payments.  In the event such a dispute arises, "the sponsors shall apply and the purchaser or the escrow agent holding the down payments in escrow may apply to the Attorney General for a determination on the disposition of the down payment and any interest earned thereon."  13 N.Y.C.R.R. § 20.3(o)(3)(viii)(a).  The regulations say nothing further about the nature of such a "determination," about any procedure the Attorney General will apply, about what submissions the participants can make or the Office will consider, about

the nature of any evidence the Office may consider, or about the criteria the Office may apply in resolving the determination.

13.     On April 9, 2010, in a series of identical Determinations, the Attorney General granted all the purchasers' applications, finding that the purchasers had the right to rescind their Purchase Agreements and directing the escrow agent to release to the purchasers the down payments that they had made on their respective purchases and that were being held as security for CRP/Extell. The Attorney General has ordered the funds to be released by May 12, 2010; they have not yet been released.

14.     The collective value of the down payments that the Attorney General has seen fit to release to the purchasers is over $16 million, and the collective value of the properties that the purchasers had purchased is over $110 million.

15.     In this action, CRP/Extell seeks redress for the many critical procedural and substantive flaws in the Attorney General's Determinations, and seeks to clarify and enforce the intended terms of the Offering Plan and the Purchase Agreements.

16.     CRP/Extell alleges that (1) it did not receive due process of law under the regulations; (2) the Attorney General exceeded the authority of the statute authorizing the Office to implement regulations in this area; (3) the determinations are affected by errors of law, and are otherwise arbitrary and capricious, and therefore warrant reversal under Article 78 of the New York Civil Practice Law and Rules; (4) CRP/Extell is entitled to reformation of the Offering Plan to reflect the parties' actual intent thereunder; and (5) motivated as they were, the purchasers breached their obligations of good faith and fair dealing under the Purchase Agreements.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction under 28 U.S.C. § 1331, because this action arises

under the Constitution and laws of the United States, and under 28 U.S.C. § 1367, on the basis of

supplemental jurisdiction over CRP/Extell's claims under state law.

18.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

19.     Plaintiff, CRP/Extell, is a limited partnership under the laws of Delaware with its

principal place of business in New York, New York.  CRP/Extell and its affiliated companies

develop and sell real estate, primarily in Manhattan. Within the meaning of the applicable

statute and regulations, CRP/Extell is the "sponsor" of the Offering Plan for The Rushmore, a

condominium development at 80 Riverside Boulevard, New York, New York 10069.

20.     Defendant Andrew M. Cuomo, in his capacity as Attorney General of the State of

New York, oversees an office acting as an administrative agency with respect to numerous

matters in the State, including the determinations at issue in this case.

21.     Defendant Stroock & Stroock & Lavan LLP ("Stroock") is a limited-liability

partnership with its principal place of business in New York, New York.  Stroock is the escrow

agent holding the down payments at issue in escrow accounts.

22.     Defendant 3to4, LLC ("3to4") is a limited-liability company with its principal

place of business in Rye, New York.  On June 18, 2007, 3to4 entered into a Purchase Agreement

with CRP/Extell to purchase Unit 22D in The Rushmore for a total purchase price of $3,200,000.

Under the agreement, 3to4 tendered to CRP/Extell a down payment of $480,000, now in escrow.

3to4's scheduled date for closing of title on its purchase was September 9, 2009.  On September

9, 2009, 3to4 filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreement.

23.    Defendant ARC Chinish RE LLC ("ARC") is a Delaware limited-liability company with its principal place of business in New York, New York.  On February 12, 2007, ARC entered into Purchase Agreements with CRP/Extell to purchase units 3B and 4D in The Rushmore for a total purchase price of $1,232,000 and $1,364,000 respectively.  Under the agreements, ARC tendered to CRP/Extell a down payment of $123,200 for unit 3B and $136,400 for Unit 4D.  These monies are in escrow.  ARC's scheduled date for closing of title on its purchase of Unit 3B was February 9, 2009.  ARC's scheduled date for closing of title on its purchase of Unit 4D was February 23, 2009.  On February 23, 2009, ARC filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreements.

24.    Defendant Atlantic NYC Investments LLC ("Atlantic NYC") is a Delaware limited-liability company with its principal place of business in Aventura Lakes, Florida.  On February 14, 2008, Atlantic NYC entered into a Purchase Agreement with CRP/Extell to purchase Unit 12M in The Rushmore for a total purchase price of $4,650,000.  Under the agreement, Atlantic NYC tendered to CRP/Extell a down payment of $697,500, now in escrow. Atlantic NYC's scheduled date for closing of title on its purchase was May 18, 2009.  On August 17, 2009, Atlantic NYC filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreement.

25.    Defendants Parker Bagley and Julie Baker are residents of the State of New York. On August 4, 2008, Mr. Bagley and Ms. Baker entered into a Purchase Agreement with CRP/Extell to purchase Unit 9C in The Rushmore for a total purchase price of $2,750,000.

Under the agreement, Mr. Bagley and Ms. Barker tendered to CRP/Extell a down payment of $275,000, now in escrow.  On May 27, 2009, Mr. Bagley and Ms. Barker filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

26.     Defendant Bincube Partners ("Bincube") is a limited-liability company with its principal place of business in New York, New York.  On November 2, 2006, Bincube entered into a Purchase Agreement with CRP/Extell to purchase Unit 18C in The Rushmore for a total purchase price of $2,200,000.  Under the agreement, Bincube tendered to CRP/Extell a down payment of $110,000, now in escrow.  Bincube's scheduled date for closing of title on its purchase was August 19, 2009.  On August 17, 2009, Bincube filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreement.

27.     Defendant BRSP Realty, LLC ("BRSP") is a limited-liability company with its principal place of business in Rye, New York.  On June 18, 2007, BRSP entered into a Purchase Agreement with CRP/Extell to purchase Unit 26D in The Rushmore for a total purchase price of $3,225,000.  Under the agreement, BRSP tendered to CRP/Extell a down payment of $483,750, now in escrow.  BRSP's scheduled date for closing of title on its purchase was September 9, 2009.  On September 9, 2009, BRSP filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreement.

28.     Defendants Christopher A. Chang and Maria Wu are residents of the State of New York.  On July 2, 2007, Mr. Chang and Ms. Wu entered into a Purchase Agreement with CRP/Extell to purchase Unit 5S in The Rushmore for a total purchase price of $1,845,000.  Under the agreement, Mr. Chang and Ms. Wu tendered to CRP/Extell a down payment of

$184,500, now in escrow.  Mr. Chang's and Ms. Wu's scheduled date for closing of title on their purchase was March 12, 2009.  On September 9, 2009, Mr. Chang and Ms. Wu filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

29.     Defendants Mark Chu and Nancy Chan are residents of the State of New York. On October 30, 2006, Mr. Chu and Ms. Chan entered into a Purchase Agreement with CRP/Extell to purchase Unit 3R in The Rushmore for a total purchase price of $1,075,000. Under the agreement, Mr. Chu and Ms. Chan tendered to CRP/Extell a down payment of $161,250, now in escrow.  Mr. Chu's and Ms. Chan's scheduled date for closing of title on their purchase was February 11, 2009.  On July 30, 2009, Mr. Chu and Ms. Chan filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

30.     Defendant Ona Colasante is a resident of the State of Florida.  On November 11, 2007, Ms. Colasante entered into a Purchase Agreement with CRP/Extell to purchase Unit 25D in The Rushmore for a total purchase price of $3,225,000.  Under the agreement, Ms. Colasante tendered to CRP/Extell a down payment of $483,750, now in escrow.  Ms. Colasante's scheduled date for closing of title on her purchase was September 9, 2009.  On June 29, 2009, Ms. Colasante filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind her Purchase Agreement.

31.     Defendants Melinda Everett and Gerard Milligan are residents of the State of New York.  On December 26, 2006, Ms. Everett and Mr. Milligan entered into a Purchase Agreement with CRP/Extell to purchase Unit 14P in The Rushmore for a total purchase price of $3,000,000. Under the agreement, Ms. Everett and Mr. Milligan tendered to CRP/Extell a down payment of

$450,000, now in escrow.  Ms. Everett's and Mr. Milligan's scheduled date for closing of title on their purchase was May 26, 2009.  On June 8, 2009, Ms. Everett and Mr. Milligan filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

32.     Defendant Jessica Faieta is a resident of the State of New York.  On February 20, 2007, Ms. Faieta entered into a Purchase Agreement with CRP/Extell to purchase Unit 3N in The Rushmore for a total purchase price of $1,000,000.  Under the agreement, Ms. Faieta tendered to CRP/Extell a down payment of $150,000, now in escrow.  Ms. Faieta's scheduled date for closing of title on her purchase was February 11, 2009.  On June 26, 2009, Ms. Faieta filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind her Purchase Agreement.

33.     Defendant Max Gilani is a resident of the State of California.  On November 9, 2007, Mr. Gilani entered into a Purchase Agreement with CRP/Extell to purchase Unit 16K in The Rushmore for a total purchase price of $1,120,000.  Under the agreement, Mr. Gilani tendered to CRP/Extell a down payment of $168,000, now in escrow.  Mr. Gilani's scheduled date for closing of title on his purchase was June 16, 2009.  On January 6, 2010, Mr. Gilani filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

34.     Defendant Benjamin Goldschlager is a resident of the State of New York.  On February 12, 2007, Mr. Goldschlager entered into a Purchase Agreement with CRP/Extell to purchase Unit 4C in The Rushmore for a total purchase price of $2,332,000.  Under the agreement, Mr. Goldschlager tendered to CRP/Extell a down payment of $233,200, now in escrow.  Mr. Goldschlager's scheduled date for closing of title on his purchase was February 23,

2009.  On February 23, 2009, Mr. Goldschlager filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

35.      Defendants Kenneth Goodman and Andrea Economos are residents of the State of New York.  On October 19, 2006, Mr. Goodman and Ms. Economos entered into a Purchase Agreement with CRP/Extell to purchase Unit 33B in The Rushmore for a total purchase price of $2,640,000.  Under the agreement, Mr. Goodman and Ms. Economos tendered to CRP/Extell a down payment of $396,000, now in escrow.  Mr. Goodman and Ms. Economos's scheduled date for closing of title on their purchase was February 23, 2009.  On August 17, 2009, Mr. Goodman and Ms. Economos filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

36.      Defendants Kenneth Goodman and Lydia Goodman are residents of the State of New York.  On October 19, 2006, Mr. and Mrs. Goodman entered into a Purchase Agreement with CRP/Extell to purchase Unit 6H in The Rushmore for a total purchase price of $858,000. Under the agreement, Mr. and Mrs. Goodman tendered to CRP/Extell a down payment of $128,700, now in escrow.  Mr. and Mrs. Goodman's scheduled date for closing of title on its purchase was March 23, 2009.  On September 9, 2009, Mr. and Mrs. Goodman filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreement.

37.      Defendant Lola Gusman is a resident of the State of New York.  On January 23, 2008, Ms. Gusman entered into a Purchase Agreement with CRP/Extell to purchase Unit 22A in The Rushmore for a total purchase price of $3,275,000.  Under the agreement, Ms. Gusman tendered to CRP/Extell a down payment of $491,250, now in escrow.  Ms. Gusman's scheduled

closing of title date on her purchase was August 26, 2009. On August 20, 2009, Ms. Gusman

filed with the Attorney General an Application for a Determination of the Disposition of

Downpayments, seeking to rescind her Purchase Agreement.

38.     Defendants Gary Huang and Evelyn Huang are residents of the State of New

York. On February 14, 2007, Mr. and Mrs. Huang entered into a Purchase Agreement with

CRP/Extell to purchase Unit 23A in The Rushmore for a total purchase price of $2,912,000.

Under the agreement, Mr. and Mrs. Huang tendered to CRP/Extell a down payment of $291,200,

now in escrow. Mr. and Mrs. Huang's scheduled date for closing of title on its purchase was

September 2, 2009. On June 26, 2009, Mr. and Mrs. Huang filed with the Attorney General an

Application for a Determination of the Disposition of Downpayments, seeking to rescind their

Purchase Agreement.

39.     Defendants Janice Huff-Dowdy and Warren Dowdy are residents of the State of

New Jersey. On December 7, 2006, Ms. Huff-Dowdy and Mr. Dowdy entered into a Purchase

Agreement with CRP/Extell to purchase Unit 19B in The Rushmore for a total purchase price of

$2,080,000. Under the agreement, Ms. Huff-Dowdy and Mr. Dowdy tendered to CRP/Extell a

down payment of $312,000, now in escrow. Ms. Huff-Dowdy's and Mr. Dowdy's scheduled

date for closing of title on their purchase was September 9, 2009. On August 17, 2009, Ms.

Huff-Dowdy and Mr. Dowdy filed with the Attorney General an Application for a Determination

of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

40.     Defendants Gyoo Gwan Kim and Su Jin Kim are residents of the State of New

Jersey. On May 15, 2007, Mr. and Mrs. Kim entered into a Purchase Agreement with

CRP/Extell to purchase Unit PH3B in The Rushmore for a total purchase price of $7,150,000.

Under the agreement, Mr. and Mrs. Kim tendered to CRP/Extell a down payment of $1,072,500,

now in escrow. Mr. and Mrs. Kim's scheduled date for closing of title on its purchase was September 30, 2009. On September 21, 2009, Mr. and Mrs. Kim filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

41.    Defendants Kyung Kim and Henry Myunghwan Kim are residents of the State of Indiana. On November 16, 2006, Mr. and Mrs. Kim entered into a Purchase Agreement with CRP/Extell to purchase Unit 37A in The Rushmore for a total purchase price of $3,060,000. Under the agreement, Mr. and Mrs. Kim tendered to CRP/Extell a down payment of $306,000, now in escrow. Mr. and Mrs. Kim's scheduled date for closing of title on their purchase was September 23, 2009. On September 21, 2009, Mr. and Mrs. Kim filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

42.    Defendants Melissa Ko and S. Douglas Hahn are residents of the State of New York. On March 20, 2007, Ms. Ko and Mr. Hahn entered into a Purchase Agreement with CRP/Extell to purchase Unit 36C/D in The Rushmore for a total purchase price of $7,150,000. Under the agreement, Ms. Ko and Mr. Hahn tendered to CRP/Extell a down payment of $1,072,500, now in escrow. Ms. Ko's and Mr. Hahn's scheduled date for closing of title on their purchase was September 23, 2009. On September 21, 2009, Ms. Ko and Mr. Hahn filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

43.    Defendants Gail S. Landis and R. Victor Berstein are residents of the State of New York. On December 26, 2006, Ms. Landis and Mr. Bernstein entered into a Purchase Agreement with CRP/Extell to purchase Unit 16M in The Rushmore for a total purchase price of

$4,890,000.  Under the agreement, Ms. Landis and Mr. Bernstein tendered to CRP/Extell a down payment of $733,500, now in escrow.  Ms. Landis and Mr. Bernstein's scheduled date for closing of title on its purchase was June 16, 2009.  On June 9, 2009, Ms. Landis and Mr. Bernstein filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

44.     Defendants Benjamin W. Lau and Judith T. Lau, as trustee for The Lau Family Trust and designated Sub-trusts Thereof are residents of the State of New York.  On February 28, 2008, Mr. and Mrs. Lau entered into a Purchase Agreement with CRP/Extell to purchase Unit 7G in The Rushmore for a total purchase price of $1,975,000.  Under the agreement, Mr. and Mrs. Lau tendered to CRP/Extell a down payment of $340,000, now in escrow.  Mr. and Mrs. Lau's scheduled date for closing of title on their purchase was April 6, 2009.  On June 26, 2009, Mr. and Mrs. Lau filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

45.     Defendant Gregory Lee is a resident of the State of Florida.  On November 28, 2006, Mr. Lee entered into a Purchase Agreement with CRP/Extell to purchase Unit 19A in The Rushmore for a total purchase price of $3,275,000.  Under the agreement, Mr. Lee tendered to CRP/Extell a down payment of $491,250, now in escrow.  Mr. Lee's scheduled date for closing of title on his purchase was September 9, 2009.  On June 26, 2009, Mr. Lee filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

46.     Defendant Seung Moh Lee is a resident of the State of New York.  On May 15, 2007, Mr. Lee entered into a Purchase Agreement with CRP/Extell to purchase Unit 16A in The Rushmore for a total purchase price of $1,500,000.  Under the agreement, Mr. Lee tendered to

CRP/Extell a down payment of $225,000, now in escrow.  Mr. Lee's scheduled date for closing of title on his purchase was September 2, 2009.  On September 9, 2009, Mr. Lee filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

47.    Defendants Haley Liberman Binn, Diane Lieberman and Lisa Ginsburg are residents of the State of New York.  On November 2, 2006, they entered into a Purchase Agreement with CRP/Extell to purchase Unit 18E in The Rushmore for a total purchase price of $2,200,000.  Under the agreement, Ms. Liberman Binn, Ms. Liberman and Ms. Ginsburg tendered to CRP/Extell a down payment of $110,000, now in escrow.  Ms. Liberman Binn's, Ms. Liberman's and Ms. Ginsburg's scheduled date for closing of title on their purchase was August 19, 2009.  On August 17, 2009, Ms. Liberman Binn, Ms. Liberman and Ms. Ginsburg filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

48.    Defendants Albert L. Marino, Jr. and Beth F. Hinnen are residents of the State of New York.  On January 16, 2008, Mr. Marino and Ms. Hinnen entered into a Purchase Agreement with CRP/Extell to purchase Unit 31A in The Rushmore for a total purchase price of $3,475,000.  Under the agreement, Mr. Marino and Ms. Hinnen tendered to CRP/Extell a down payment of $521,250, now in escrow.  Mr. Marino and Ms. Hinnen's scheduled date for closing of title on their purchase was September 16, 2009.  On September 9, 2009, Mr. Marino and Ms. Hinnen filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

49.    Defendants Alan Meyers and Evelyn Meyers are residents of the State of New York.  On February 1, 2008, Mr. and Mrs. Meyers entered into a Purchase Agreement with

CRP/Extell to purchase Unit 31B in The Rushmore for a total purchase price of $2,950,000. Under the agreement, Mr. and Mrs. Meyers tendered to CRP/Extell a down payment of $442,500, now in escrow.  Mr. and Mrs. Meyers executed riders to their agreements on February 24, 2009.  Mr. and Mrs. Meyers scheduled date for closing of title on their purchase was September 16, 2009.  On June 26, 2009, Mr. and Mrs. Meyers filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

50.     Defendant Trevor Moran is a resident of the State of New York.  On November 3, 2006, Mr. Moran entered into a Purchase Agreement with CRP/Extell to purchase Unit 38A in The Rushmore for a total purchase price of $3,475,000.  Under the agreement, Mr. Moran tendered to CRP/Extell a down payment of $521,250, now in escrow.  Mr. Moran's scheduled date for closing of title on his purchase was September 23, 2009.  On June 26, 2009, Mr. Moran filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

51.     Defendants Marla C. Muns and Kimberly McNeese are residents of the State of Texas.  On December 26, 2006, Ms. Muns and Ms. McNeese entered into a Purchase Agreement with CRP/Extell to purchase Unit 33A in The Rushmore for a total purchase price of $3,350,000. Under the agreement, Ms. Muns and Ms. McNeese tendered to CRP/Extell a down payment of $502,500, now in escrow.  Ms. Muns and Ms. McNeese's scheduled date for closing of title on their purchase was September 23, 2009.  On June 26, 2009, Ms. Muns and Ms. McNeese filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

52.     Defendant Mitchell E. Newman is a resident of the State of New Jersey.  On May 1, 2007, Mr. Newman entered into a Purchase Agreement with CRP/Extell to purchase Unit 38C/D in The Rushmore for a total purchase price of $7,400,000.  Under the agreement, Mr. Newman tendered to CRP/Extell a down payment of $1,110,000, now in escrow.  Mr. Newman's scheduled date for closing of title on his purchase was September 23, 2009.  On August 17, 2009, Mr. Newman filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

53.     Defendants Hyun Kyu Park and Doja Song are residents of the State of New York.  On December 14, 2007, Mr. Park and Ms. Song entered into a Purchase Agreement with CRP/Extell to purchase Unit 12A in The Rushmore for a total purchase price of $1,425,000.  Under the agreement, Mr. Park and Ms. Song tendered to CRP/Extell a down payment of $213,750, now in escrow.  Mr. Park and Ms. Song's scheduled date for closing of title on their purchase was August 26, 2009.  On June 26, 2009, Mr. Park and Ms. Song filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

54.     Defendants Philip and Glennis Politziner are residents of the State of New Jersey.  On March 16, 2007, Mr. and Mrs. Politziner entered into a Purchase Agreement with CRP/Extell to purchase Unit 11B in The Rushmore for a total purchase price of $3,550,000.  Under the agreement, Mr. and Mrs. Politziner tendered to CRP/Extell a down payment of $532,500, now in escrow.  Mr. and Mrs. Politziner's scheduled date for closing of title on their purchase was May 11, 2009.  On August 6, 2009, Mr. and Mrs. Politziner filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

55.     Defendants Shirley Romig and Nicholas Romig are residents of the State of New York.  On February 20, 2008, Mr. and Mrs. Romig entered into a Purchase Agreement with CRP/Extell to purchase Unit 3D in The Rushmore for a total purchase price of $1,500,000. Under the agreement, Mr. and Mrs. Romig tendered to CRP/Extell a down payment of $225,000, now in escrow.  Mr. and Mrs. Romig's scheduled date for closing of title on their purchase was February 10, 2009.  On June 26, 2009, Mr. and Mrs. Romig filed with the Attorney General an "Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

56.     Defendant Michael Salerno is a resident of the State of New Jersey.  On October 19, 2006, Mr. Salerno entered into a Purchase Agreement with CRP/Extell to purchase Unit 38B in The Rushmore for a total purchase price of $2,750,000.  Under the agreement, Mr. Salerno tendered to CRP/Extell a down payment of $412,500, now in escrow.  Mr. Salerno's scheduled date for closing of title on his purchase was September 23, 2009.  On August 6, 2009, Mr. Salerno filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

57.     Defendants Pauline Shender and Alex Shender are residents of the State of New York.  On November 28, 2007, Mr. and Mrs. Shender entered into a Purchase Agreement with CRP/Extell to purchase Unit 20A in The Rushmore for a total purchase price of $3,150,000. Under the agreement, Mr. and Mrs. Shender tendered to CRP/Extell a down payment of $472,500, now in escrow.  Mr. and Mrs. Shender's scheduled date for closing of title on their purchase was September 9, 2009.  On June 26, 2009, Mr. and Mrs. Shender filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

58.     Defendants Edward M. Solomon and Barbara Solomon are residents of the State of New Jersey.  On July 2, 2007, Mr. and Mrs. Solomon entered into a Purchase Agreement with CRP/Extell to purchase Unit 5G in The Rushmore for a total purchase price of $1,900,000.  Under the agreement, Mr. and Mrs. Solomon tendered to CRP/Extell a down payment of $285,000, now in escrow.  Mr. and Mrs. Solomon's scheduled date for closing of title on their purchase was March 11, 2009.  On May 26, 2009, Mr. and Mrs. Solomon filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

59.     Defendant Han Soon Yom is a resident of the State of New York.  On January 4, 2008, Mr. Yom entered into a Purchase Agreement with CRP/Extell to purchase Unit 18F in The Rushmore for a total purchase price of $2,200,000.  Under the agreement, Mr. Moran tendered to CRP/Extell a down payment of $330,000, now in escrow.  Mr. Yom's scheduled date for closing of title on his purchase was August 19, 2009.  On June 26, 2009, Mr. Yom filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind his Purchase Agreement.

60.     Defendants Pil Yoon and Young Yoon are residents of the State of Maryland.  On March 16, 2007, they entered into a Purchase Agreement with CRP/Extell to purchase Unit 15K in The Rushmore for a total purchase price of $1,050,000.  Under the agreement, Mr. and Mrs. Yoon tendered to CRP/Extell a payment of $157,500, now in escrow.  Mr. and Mrs. Yoon's scheduled date for closing of title on their purchase was June 2, 2009.  On June 26, 2009, Mr. and Mrs. Yoon filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind their Purchase Agreement.

61.    The Defendants identified in Paragraphs 22-60 above are collectively referred to herein as the "Purchasers."

## BACKGROUND

## THE ATTORNEY GENERAL'S RELEVANT AUTHORITY

62.    Under Article 23-A of the New York General Business Law (the "GBL"), the Attorney General has promulgated regulations governing, among other real estate, newly constructed condominiums.  13 N.Y.C.R.R. Part 20.

63.    Section 352-e of the GBL and the regulations thereunder authorize the Attorney General to ensure that in offering plans such as the one that CRP/Extell used here, a "sponsor" such as CRP/Extell must disclose to potential purchasers that if the first closing on a unit in the condominium building does not occur within twelve (12) months of the estimated date of the first closing identified in the offering plan, then the purchaser will have the right to rescind its purchase agreement and recover the down payment it had made.  13 N.Y.C.R.R. § 20.3(o)(12).

64.    Sections 352-e and 352-h of the GBL provide that the down payments that purchasers make on condominium units must be placed into escrow accounts, and the Attorney General is "authorized to adopt, promulgate, amend and rescind suitable rules and regulations . . . determining when escrow funds may be released."  Section 352-e(2)(b).

65.    In the event a dispute arises regarding the down payment, the sponsors are required to apply and the purchaser or escrow agent has the option of applying to the Attorney General for a "determination" regarding the dispute.  13 N.Y.C.R.R. § 20.3(o)(3)(viii)(a).

66.    The regulations provide as follows:  "In the event of a dispute, the sponsors shall apply and the purchaser or the escrow agent holding the down payments in escrow may apply to

the Attorney General for a determination on the disposition of the down payment and any interest earned thereon." Id.

67.     The regulations say nothing further about the nature of such a "determination," about any procedure the Attorney General will apply, about what submissions the participants can make or the Office will consider, about the nature of any evidence the Office may consider, or about the criteria the Office may apply in resolving the determination.

68.     The Attorney General interprets the regulations to mean that the Office has the discretion not to exercise its authority to make such a determination, and instead permit the parties to bring their dispute in court.

69.     The GBL generally authorizes the Attorney General to issue subpoenas and conduct a hearing with respect to matters under the Office's purview, but the regulations provide no guidance as to when the Office will, or must, exercise such authority with respect to "determinations" such as at issue here.

70.     Section 352 gives the Attorney General the right to subpoena witnesses and conduct a hearing in the exercise of its authority.  Section 352 provides, in relevant part:

> 1.  Whenever it shall appear to the attorney-general, either upon complaint or otherwise, that . . . in the . . . sale . . . of . . . securities . . . any . . . corporation . . . shall have engaged . . . in any practice or transaction or course of business relating to the . . sale of securities . . . which is . . . in violation of law . . ., he may in his discretion . . . make such special and independent investigations as he may deem necessary in connection with the matter.
>
> 2.  The attorney-general . . . is empowered to subpoena witnesses, compel their attendance, examine them under oath before him or a magistrate, a court of record or a judge or justice thereof and require the production of any books or papers which he deems relevant or material to the inquiry.

GBL § 352(1, 2). Section 352-e, in turn, makes clear that the condominium interests at issue here constitute "securities" under Sections 352. GBL § 352-e(1)(a).

## THE OFFERING PLAN, PURCHASE AGREEMENTS, AND APPLICATIONS

71.     CRP/Extell developed The Rushmore, a newly constructed luxury condominium located at 80 Riverside Boulevard, New York, New York.

72.     In connection with its proposed sale of units in The Rushmore, and as required by law, CRP/Extell published an Offering Plan dated August 11, 2006, for the condominium. The Offering Plan is 757 pages long. CRP/Extell subsequently made many Amendments to the Plan.

73.     In the Offering Plan, the projected first year of condominium operations was September 1, 2008, through August 31, 2009.

74.     The Purchasers entered into Purchase Agreements for the purchase of units in The Rushmore. In their respective Purchase Agreements, each Purchaser agreed to purchase the unit identified therein for the purchase price set forth therein, as set forth above. Purchasers agreed to provide an "Initial Deposit" and an "Additional Deposit" as down payments for their payment obligations under the Purchase Agreements. Each Purchaser agreed to pay the balance of the purchase price upon delivery of the deed for the property it had purchased. Closing of title for the Purchasers' respective units was scheduled on the dates set forth above.

75.     The amount of the down payments paid by Purchasers for the properties they had purchased is over $16 million, and the collective value of the properties is over $110 million.

76.     The down payments were all placed in escrow under 13 N.Y.C.R.R. § 20.3(o) in accordance with the Offering Plan. The escrow agent holding the down payments is the law firm of Stroock & Stroock & Lavan LLP.

77.     None of the Purchasers secured an individual unit outside closing-date guarantee, by which CRP/Extell would guarantee that a particular Purchaser's closing of title to the condominium unit it purchased would take place by a date certain.

78.     The Purchase Agreements incorporate by reference CRP/Extell's Offering Plan. The Offering Plan contains a provision that states as follows:

> It is anticipated that the First Closing will occur by the commencement date for the First Year of Condominium Operation as set forth in Schedule B which is September 1, 2008.  If the First Closing does not occur by September 1, 2008, as such date may be extended by duly filed amendment to the Plan, Sponsor will amend the Plan to update the budgets and to offer Purchaser the right to rescind their agreements within fifteen (15) days after the presentation of the amendment disclosing the updated budget, and any Purchaser electing rescission will have their Deposits and any interest earned thereon returned.

This provision was CRP/Extell's good faith attempt to comply with Section 20.3(o)(12) of the regulations, requiring CRP/Extell to grant a right to rescind if the first closing is delayed twelve (12) months beyond the anticipated commencement of the first year of operations.  Under the regulations and Offering Plan, the date of the first closing of title has no relationship to when any particular unit will be completed or will close; there is no outside closing date specified with respect to any particular unit.

79.     The first closing of a unit in The Rushmore did not occur by September 1, 2008. CRP/Extell did not regard that date as the actual rescission date, and therefore did not offer any purchaser any right of rescission as a result of the non-occurrence of the first closing by that date.

80.     None of the Purchasers sought to rescind their agreements within fifteen days of September 1, 2008, or otherwise requested that CRP/Extell duly file an amendment offering such right to rescind, on the basis of the foregoing provision.  None of the Purchasers sought to exercise alleged rights to rescind their Agreements on the grounds that the first closing of title to

a unit in The Rushmore did not take place within one day of the projected first date of closing, September 1, 2008.  Indeed, on September 24, 2008, CRP/Extell published an amendment to the Offering Plan, reiterating that the "actual first year of Condominium operation may be earlier or later" than projected, that CRP/Extell made no guarantees regarding such date, and that if the actual date of first closing of title is delayed by more than six months from the projected date, purchasers will have the right to rescind their agreements only if the budget for condominium operations increases by 25% or more.  Having received that amendment, not a single purchaser responded by claiming that CRP/Extell was obligated to offer a right of rescission.  No purchaser even inquired about such a possibility.

81.     On February 23, 2009, over five months after September 1, 2008, Purchaser ARC filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreements on the ground that the first closing of title had not taken place on September 1, 2008.  Over the next year, the other Purchasers filed similar applications with the Attorney General, as set forth above.

82.     Purchasers argued in support of their Applications that CRP/Extell should be bound by the date of September 1, 2008, typed into the Offering Plan.  CRP/Extell argued in opposition (and in support of its own cross-application regarding the down payments) that the date of September 1, 2008, was a scrivener's error and mistake that did not reflect the parties' actual intent, and therefore that CRP/Extell is entitled to seek reformation of the Plan.

83.     The Attorney General declined to have the determination be made by a court of law, where CRP/Extell could take discovery and present the extrinsic evidence uncovered therein concerning the intent of the parties, and decided to determine whether to order release of the $16 million in escrow funds on submission of the papers.

## THE PURCHASERS' MOTIVATION

84.     The Purchasers chose to exercise their asserted rights of rescission following a significant downturn in the economy in general and in the real-estate market in New York in particular.  If they can rescind their Purchase Agreements, the Purchasers will succeed in avoiding the obligation to complete their payments on real estate in a depressed market.

85.     If there were any doubt about the Purchasers' motivation in exercising their asserted rights of rescission, the attorney for thirty of the Purchasers made the issue crystal clear when he admitted in a July 2009 article in <u>The New York Times</u> that many Purchasers filed their application because they were hoping for "the chance to buy in at a lower price" and thus opportunistically pass off to CRP/Extell the risk that the Purchasers had assumed in entering into binding contracts to purchase the units prior to the decline in the market.

## THE ATTORNEY GENERAL'S DETERMINATIONS

86.     On April 9, 2010, the Attorney General issued its Determinations that the rescission date of September 1, 2008, as typed into the foregoing provision of the Offering Plan, binds CRP/Extell.  The Attorney General has directed the escrow agent to release the down payments by May 12, 2010.  The escrow agent has not yet released the funds.

87.     The Attorney General thus directed CRP/Extell to offer all Purchasers the unconditional right to rescind their Purchase Agreements, even though none of the Purchasers had sought to exercise such right within fifteen days of September 1, 2008, or even within five months of that date.  The Attorney General directed CRP/Extell to offer Defendant Gilani the unconditional right to rescind his Purchase Agreement, for example, where he did not seek to exercise his alleged right to rescind until January 2010 – more than fifteen months after September 1, 2008.

88.     The primary bases for the Determinations, as set forth in further detail below, were that CRP/Extell had presented "no evidence" that the parties intended a rescission date other than September 1, 2008; that the integration clause in the Purchase Agreement might preclude consideration of parol evidence even where a claim of scrivener's error is asserted; that the Offering Plan unambiguously identifies September 1, 2008, as the rescission date; that there is no ambiguity within the Plan as a whole as to whether a purchaser would have a money-back guarantee if the first closing did not occur by September 1, 2008; that in a hypothetical "highly competitive" real-estate market, it would make sense for a sponsor to give purchasers an immediate right of rescission if the first closing of title occurred even a single day after the estimated date of first closing; that by its reading of some extrinsic evidence, CRP/Extell might guarantee a first closing of title to take place prior to the full year after the estimated date of first closing that is required; that the parties' course of conduct under the Plan and Agreements was "beside the point"; and that declining to enforce the rescission date typed into the Offering Plan would "send the wrong message" to purchasers.

### THE ATTORNEY GENERAL'S PROCEDURAL APPROACH
### TO EXTRINSIC EVIDENCE

89.     The Attorney General was first apprised of a dispute between CRP/Extell and a purchaser concerning a right of rescission on or about February 23, 2009.

90.     In the ensuing year, during which thirty-nine others purchasers filed applications with the Attorney General in an effort to rescind or renegotiate their agreements, the Office did not take any discovery and did not offer the parties the ability to take any discovery or cross-examine any witnesses to obtain extrinsic evidence in support of their arguments concerning the parties' intent under the Offering Plan and Purchase Agreements. Nor did the Attorney General issue any subpoenas for any such evidence. It also did not conduct any hearing.

91.     Instead, the Attorney General conveyed to CRP/Extell that that there would be no occasion for it to collect evidence from the Purchasers or from third parties, and that such evidence would not be particularly relevant to the Office's determination.  An attorney in the Office advised CRP/Extell that with respect to these determinations, the Office would not take depositions or otherwise allow CRP/Extell to take testimony of the purchasers, and told CRP/Extell that the Office was not seeking to determine the intent the parties had in their minds when they drafted the Offering Plan or entered into the Purchase Agreements.

92.     CRP/Extell reasonably understood, including from the Attorney General's failure to issue any subpoenas or otherwise seek extrinsic evidence, that the Office was planning to limit its consideration of the issues to the text of the Offering Plan.

93.     CRP/Extell further reasonably understood that where the Attorney General had the discretion to decline to resolve the determinations and instead let them proceed in court where the parties could obtain and present extrinsic evidence regarding the parties' intent, the Office's decision to preclude CRP/Extell from doing so meant that the Office was going to interpret the Offering Plan without trying to discern the parties' intent, including through consideration of extrinsic evidence of the parties' intent.

94.     Having proceeded in that fashion, in its Determinations the Attorney General nevertheless acknowledged the potential relevance of extrinsic evidence and undertook to consider such evidence – but only a fraction of what it should have considered (that is, the limited body of evidence that the parties could obtain without any discovery or cross-examination of the relevant witnesses).

95.     The Determinations cite the alleged failure of CRP/Extell to present extrinsic evidence in support of several of its arguments and positions, despite the obvious limitations of CRP/Extell's ability to obtain such evidence in the absence of discovery.

96.     The Attorney General noted, for example, that the question of the relevance of the integration clause in the Offering Plan "need not be reached because no parol evidence on the subject has been presented" (Determinations at 4 n.1), but then later opined that "there is other evidence that the selection of the September 1, 2008 rescission date was not a typographical error" in light of an initial draft of the Offering Plan and language in an entirely separate offering plan (id. at 13 n.4).

97.     The Attorney General's consideration of such random, limited extrinsic evidence aggravated its failure to have sought to identify and collect all such evidence itself, and to afford the parties any adequate opportunity to obtain and present any such evidence themselves.

### THE ATTORNEY GENERAL'S CONSIDERATION OF CONTRACT LAW

98.     In its Determinations, the Attorney General addresses cases applying the New York law of contracts. Although the Attorney General expressed uncertainly on the issue, under that law, the Office was obligated to consider all of the relevant extrinsic evidence, but it did not.

99.     Under New York law, because the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties, the parol evidence rule does not apply to bar consideration of parol or extrinsic evidence to determine the intent of the parties.

100.    Instead, the fact-finder must consider such evidence in determining the parties' intent and the extent to which the terms of the contract reflect that intent. Even a clear and unambiguous contract does not trump evidence of the parties' actual intent, as that would essentially defeat the argument for reformation.

101.    The evidence of extrinsic factors, including the circumstances surrounding the negotiation of the contract at issue and the motive of the parties, is critical to determining the parties' actual intent.

102.    CRP/Extell reasonably expects that several related types of extrinsic evidence will shed light on the parties' intent under the Offering Plan and show it to be contrary to the Determinations here.

103.    Such evidence includes the evidence of the intent of CRP/Extell (and of its outside counsel who drafted the Offering Plan), the intent of the Purchasers, the relevant custom and practice in this industry, and the conditions in the relevant real-estate market as of the date of the Offering Plan.

104.    The extrinsic evidence of CRP/Extell's intent will confirm what the language of the Offering Plan as a whole makes clear – namely, that CRP/Extell did not intend to provide purchasers a money-back guarantee that the first closing would occur by September 1, 2008, but rather did intend to avail itself of the regulatory framework and preserve for itself the legal cushion of avoiding unfavorable contractual rescissions in the altogether likely event that the first closing did not occur by the exact date of the projected first closing, September 1, 2008.

105.    CRP/Extell reasonably expects that the testimony of the attorneys responsible for drafting the Offering Plan will also so confirm.  CRP/Extell further submits that the testimony of the Purchasers themselves will confirm that they did not intend to secure for themselves the immediate right to rescind if the first closing did not occur by the exact date of the projected first closing, September 1, 2008, and did not even reasonably expect that such a result would unfold.

106.    The fact that no Purchaser even inquired about any rescission right for many months after September 1, 2008, shows that they did not regard that date as the relevant date for triggering rescission rights.

107.    The evidence of custom and practice in this industry, in turn, will buttress the foregoing, direct extrinsic evidence of the parties' intent.  Custom and practice constitute relevant extrinsic evidence under the New York law of contracts.

108.    In applying the requirement that Purchasers be afforded a right of rescission if the first closing has not occurred within a year of the estimated date of first closing, sponsors like CRP/Extell give themselves the full year in which to achieve the first closing, and guarantee that date because they are required to do so by regulation.

109.    Just as importantly, the evidence will show that sponsors do not give purchasers an immediate right of rescission if the first closing is delayed by more than twelve months past the projected date for such first closing, particularly where the Offering Plan repeatedly states that the Sponsor cannot guarantee and is not guaranteeing that the first closing will occur on the projected date.

110.    A further piece of critical extrinsic evidence that the Attorney General erred in failing to consider was the actual evidence of the conditions of the real-estate market at the time of the Offering Plan.

111.    Trying to square the Determinations with the obvious question of whether the reading of the provision with the typographical error could make any commercial sense, the Attorney General reasoned (at 12-13) that in a "highly competitive market" – by implication, one in which sponsors had to provide relatively more incentives to induce purchasers to buy units – it

could make sense for a sponsor to give purchasers an immediate right of rescission if the first closing had not occurred by the estimate date of first closing.

112.     That analysis begged the question of whether the market <u>was</u> "highly competitive" at the time of the Offering Plan here.  It was not.  In 2006, when the Offering Plan was drafted, there was robust demand in New York City for real estate, and CRP/Extell can present evidence to establish that fact.

113.     The Attorney General also would have been hard-pressed to explain away the significance of CRP/Extell's marketing materials concerning the building.  In those materials, distributed in 2006 and 2007, CRP/Extell stated that it expected units to open in "Winter 2008" – that is, December 2008 or later.

114.     Those materials are thus inconsistent with any suggestion that CRP/Extell was trying to induce purchasers to purchase units in The Rushmore by offering them (in the Offering Plan) a unique money-back guarantee that the first closing in the building would occur by September 1, 2008 – months prior to the time it actually advertised in its marketing materials.

115.     Indeed, even in one of their primary submissions, the Purchasers alleged that CRP/Extell's sales office had "repeatedly" told them that the building would be ready for occupancy by the "fall of 2008" – which, even bending over backwards to construe in favor of the Purchasers – could not actually mean September 1, 2008.  There is good reason for dubiety over the Purchasers' citation to those allegations, moreover, where no Purchaser has alleged that it even raised with CRP/Extell the issue of the first closing date for many months after September 1, 2008.

## THE ATTORNEY GENERAL'S CONSIDERATION
## OF THE OFFERING PLAN

116.   The Attorney General decided that read in its entirety, the Offering Plan contains
no ambiguity on the question of whether the parties intended for the Purchasers to have a money-
back guarantee that the first closing would occur by September 1, 2008.

117.   The terms of the Offering Plan, however, cannot be reasonably read to reflect the
parties' intent that the Purchasers had such a guarantee.  There are multiple provisions of the
Offering Plan in which CRP/Extell took great care to make clear that it could not and would not
guarantee that the first closing would occur by September 1, 2008.

118.   The Offering Plan contains a provision, for example, allowing for rescission if the
first closing does not take place within six months from the anticipated date of first closing only
if the projected budget increases by 25% or more.  Such a conditional right to rescind is, at an
absolute minimum, difficult to reconcile with reading the Offering Plan to mean that the
Purchasers already had an unconditional right to rescind if CRP/Extell had already missed the
projected first closing date by a single day.  Such a reading thus reflects, again at a minimum,
ambiguity on the issue of the parties' intent.

119.   In point of fact, moreover, if the unconditional rescission date in the Offering Plan
is supposedly September 1, 2008, then the foregoing rescission provision creates a much more
fundamental contradiction than the Attorney General was willing to acknowledge.  Under the
Attorney General's reading, the Offering Plan first gives purchasers the unconditional right to
rescind their Purchase Agreements if the first closing of title on a unit had not occurred by
September 1, 2008; and then gives purchasers only a conditional right to rescind their Purchase
Agreements six months later if the building is 25% over budget.  That reading makes no sense at
all.  The only commercially reasonable way for the Offering Plan to operate is for it first to give

purchasers the conditional right to rescind (if the building is 25% over budget), and thereafter –

if things have gotten worse, such that title has not closed on the first unit within even a year of

the estimated date – to give purchasers an unconditional right to rescind.  Indeed, that is exactly

the progression set forth in the very regulations that require sponsors to set forth such dates, on

such timetables, in their offering plans.

120.    The Offering Plan contains several other statements entirely inconsistent with any

money-back guarantee that the first closing would occur by September 1, 2008, such as:

- The "First Closing may occur sooner or later than the projected first year of condominium operation."

-  "Sponsor does not . . . warrant or guarantee the foregoing completion or occupancy dates for the Building due to Unavoidable Delays."

- "Sponsor makes no representation regarding the commencement date for the first year of Condominium operation."

-  "No assurance can be given with regard to the accuracy of any projected completion dates set forth herein."

121.    If the parties in fact had intended for a money-back guarantee if the first closing

did not take place exactly on the projected date of September 1, 2008, these other provisions are

inconsistent with that suggestion.  There can be no reasonable dispute on that point.

122.    Indeed, as it turned about, the Attorney General chose to avoid the question of the

parties' actual intent.  Instead, the Determinations addressed (at 12-13) the different question of

whether in a hypothetical world it might make sense for a sponsor to provide a money-back

guarantee that the first closing would occur by the projected date for the first closing.  That is not

the same as undertaking to determine what the parties actually intended, and that is not what the

law considers in interpreting the binding terms of a contract.

123.    Even entertaining such a hypothetical world, moreover, the Attorney General's interpretation is not reasonable.  The analysis ignored the fundamental point that in such a world, a sponsor would not have repeatedly emphasized its inability and unwillingness to promise a first closing by the projected date.  There is simply no way of reconciling the entirety of the Offering Plan with a reading of a money-back guarantee for the date of September 1, 2008.

## THE ATTORNEY GENERAL'S CONSIDERATION OF SOME EXTRINSIC EVIDENCE

124.    In addition to the legal errors inherent in its treatment of prospective extrinsic evidence in general, in several respects the Attorney General erred in considering only a limited subset of extrinsic evidence (that is, only the evidence parties could obtain from their own files) and in construing such evidence far too narrowly.

125.    The Attorney General cited the initial proposed offering plan, for example, but that does not advance the analysis of the parties' intent.  The Determinations state (at 13 n.4): "Sponsor's initial proposed offering plan has the same language of the Provision but with a February 1, 2008 date for both the First Closing and the right of rescission."

126.    Absent further extrinsic evidence, however, the Attorney General's citation to the initial proposed offering plan accomplishes nothing more than identifying the original source of the mistake.  It is at least as reasonable to conclude from the initial proposed offering plan, in other words, that the mistakenly matched dates of "February 1, 2008" were both changed to "September 1, 2008," preserving the initial mistake.

127.    In addition, the Attorney General's brief analysis of the offering plan for another condominium (the Avery Condominium), which Purchasers submitted to the Office just days before the Determinations, is conspicuously incomplete.  The Attorney General reasoned (at 13 n.4) that in that offering plan "the sponsor specified a rescission date six months after the

projected first closing date, which undermines Sponsor's contention here that no sponsor would ever choose a rescission date earlier than the 12-month period permitted in the Regulation."

128.   As an initial matter, the rescission date in the offering plan for the Avery Condominium is support for the proposition, also part of CRP/Extell's arguments, that no sponsor would ever choose a rescission date that is the exact same as the projected date of the first closing, especially in an offering plan in which the sponsor repeatedly emphasizes its inability to guarantee an actual closing by the projected date of the first closing.

129.   The Attorney General acknowledged, moreover, that CRP/Extell regards that six-month period in the Avery offering plan as a mistake, a point that the Office had to admit (also at 13 n.4) is "a matter not free from doubt." In nevertheless treating the language in that offering plan as extrinsic evidence that supported its analysis, rather than considering the full scope of such evidence or even acknowledging the inferences to be drawn in CRP/Extell's favor, the Attorney General committed legal error.

130.   The Attorney General's decision to resolve the foregoing question against Extell without any evidence that the Avery offering plan did not contain an error was arbitrary and capricious. Indeed, the Avery offering plan contains the same conditional right to rescission as the Offering Plan for The Rushmore. By interpreting the Avery offering plan to mean that purchasers were given the right to rescind their agreements if the first closing did not take place within six months of the projected first closing date, rather than within twelve months of that date, the Attorney General thus ignored and rendered meaningless the separate, express provision of the Avery offering plan that provided purchasers with the right to rescind if the first closing was delayed by more than six months only if the budget changed by 25 percent or more. The Attorney General's reading of the Avery offering plan means that the plan offers a redundant

unconditional right of rescission in the very same circumstance where there is an express conditional right of rescission. That is not a remotely reasonable reading of the plan.

131.    The Attorney General's reliance on its interpretation of the Avery offering plan was particularly egregious because CRP/Extell was not given an adequate opportunity to set forth its position regarding that plan or even point out the foregoing absurdity that would result from Purchasers' interpretation of that plan.

132.    In addition, the probative value of the Avery offering plan must reasonably turn on the volume of other offering plans, and how they treat the issue of the rescission date. CRP/Extell has many plans, and sponsors across the City have hundreds of such plans, that contain a rescission date a full year after the projected date of first closing, mirroring the requirement of the regulations and confirming the practice.

133.    In addition, in basing a critical aspect of its analysis on a hypothetical "highly competitive marketplace," the Attorney General also failed to appreciate how actual extrinsic evidence on that point would have informed the analysis. The Attorney General reasoned (at 12): "It is entirely conceivable that a seller in a highly competitive marketplace might offer an opportunity for Purchasers to get their deposit money back shortly after the projected First Closing date rather than have their funds remain in escrow for an additional twelve (12) months. Such an offer could be a powerful inducement to prospective purchasers."

134.    With respect to determining the actual intent of the parties, however, this reasoning begs the question. If the Offering Plan was not executed in a "highly competitive marketplace," then it would not be logical to conclude that either party intended for the purchasers to be able to walk away from their contractual commitment to purchase the unit and get their deposit money back "shortly after the projected First Closing date." The Attorney

General's analysis in this regard thus further underscored the missed opportunity to use extrinsic evidence properly.

135.   The Attorney General's speculation regarding CRP/Extell's use of a guaranteed first closing date to incentivize purchasers is also inconsistent with the fact that CRP/Extell did not advertise such a guarantee to any purchasers, and, to the contrary, repeatedly made clear to purchasers – throughout the Offering Plan, in multiple Amendments to the Offering Plan sent out to Purchasers in 2007 and 2008 (including after September 1, 2008), and in the marketing materials sent to the Purchasers – that CRP/Extell was not providing any guarantee with respect to the first year of operations or the projected date of the first closing of title.

136.   The Attorney General's speculation regarding CRP/Extell's use of a guaranteed first closing date to incentivize purchasers is also inconsistent with the fact that CRP/Extell refused to grant any individual Purchaser such a guarantee with respect to the individual Purchaser's closing date – a guarantee that, unlike a guarantee regarding the date of first closing in the building, would have a direct impact on a Purchaser.

137.   The Attorney General also failed to afford reasonable meaning to the Purchasers' inaction under their purported right to rescind. The Determinations state (at 17): "The date on which individual purchasers decided to submit applications for determinations is beside the point. There are numerous reasons why a party might hesitate before commencing legal proceedings, many of which have nothing to do with the merits of the claim."

138.   As an initial matter, to describe the submission of an application as "commencing legal proceedings" overstates the issue. The fact is that if a Purchaser believed it had a right of rescission, all it had to do to preserve its alleged rights was to file a simple application to that effect with the Attorney General. The persistent failure of so many Purchasers to do any such

things is noteworthy, not insignificant.  The larger significance of such delay, moreover, is that it reflects the Purchasers' course of performance under the Offering Plan.  Such evidence is relevant because it tends to demonstrate the parties' intent under the Offering Plan at issue. The Purchasers' delay is evidence that they had not intended to secure for themselves the right to walk away from their Purchase Agreements if the first closing in the condominium did not take place by the exact projected date of September 1, 2008, because if they had, they would have exercised their right of rescission much sooner than several months (and in some cases a year or more) after that date, especially considering the downturn in the real estate market that was well underway by that time.  Such delay is particularly noteworthy, moreover, where on September 24, 2008, CRP/Extell published an amendment to the Offering Plan reiterating that the "actual first year of Condominium operation may be earlier or later" than projected, that CRP/Extell made no guarantees regarding such date, and that if the actual date of first closing of title is delayed by more than six months from the projected date, purchasers will have the right to rescind their agreements only if the budget for condominium operations increases by 25% or more.  Having received that amendment, not a single purchaser responded by claiming that CRP/Extell was obligated to offer a right of rescission.  Indeed, no purchaser even inquired about such a possibility.

139.    It was legal error for the Attorney General to describe such inaction as "beside the point"; it went directly to the point – that the Purchasers did not have the intent to secure a money-back guarantee that they could rescind their agreements if the first closing did not take place by the exact projected date of September 1, 2008.

140.    In this additional respect, moreover, the Attorney General's logic reflects its

ultimate view based in policy rather than law that regardless of the parties' mutual intent

CRP/Extell ought to be stuck with the date typed into the Offering Plan.

### THE ATTORNEY GENERAL'S POLICY-MAKING

141.    Notwithstanding the Attorney General's gestures toward interpreting the Offering

Plan and citing New York law to do so, the Determinations turn on policy-based considerations

that fall outside the long-established tenets of contract construction – and that a court could not

permissibly interpose.  The Attorney General did so in several respects.

142.    The Attorney General expressly based its conclusion on what "message" should

or should not be sent about the statements in sponsors' offering plans.  In doing so, the Attorney

General misapplied the relevant legal standard.  Seeking to distinguish one case, and then setting

forth the culmination of its analysis of "Scrivener's Error, Mistake and Reformation," the

Attorney General stated:

> Here, by contrast, no document has been presented that contradicts
> the Offering Plan or provides a different rescission date.  Nor has
> Sponsor presented any evidence of any other communications or
> representations that would have put purchasers, who signed
> Offering Plans months, and in many cases, over a year before
> September 1, 2008, on notice that Sponsor meant 2009 when it
> wrote 2008 in the Offering Plan.  To allow Sponsor in these
> circumstances to change the Offering Plan and apply it
> retroactively would send the wrong message about the importance
> of statements made by sponsors in offering plans.

(Determinations at 8-9.)  This statement thus reveals the policy-based linchpin of the Attorney

General's analysis – that if the Office were properly to apply New York law to interpret an

Offering Plan to provide for a rescission date other than the date typed into the Offering Plan,

then the Office would be sending the "wrong message."

143.    The right "message" presumably is that the plain language in offering plans is important and that purchasers are entitled to rely on it.  Under the rules of contract interpretation, however, such considerations are not the final analysis; instead, they are the baseline rules for which the law makes express and well-established exceptions in considering "Scrivener's Error, Mistake and Reformation."

144.    Indeed, the literal import of the Attorney General's reasoning is that regardless of the actual intent or understanding of the purchasers, unless the sponsor had made "communications" or "representations" to the purchasers that a date different from the one typed in the Offering Plan was the intended rescission date, then the typed date must control.  That is not the law.  It is simply the rule the Attorney General decided to apply.

145.    The Attorney General later adopted a further standard that is apparently designed to protect and benefit purchasers, but that finds no support in the law of contract interpretation.  Confirming that its conclusions did not turn on its view of what the parties actually intended, and then expanding on the point, the Attorney General stated:

> As noted, the Attorney General will not rewrite an Offering Plan because Sponsor now contends that its Offering Plan – whether intentionally or not – was more generous to purchasers than the law requires.  It is entirely conceivable that a seller in a highly competitive marketplace might offer an opportunity for purchasers to get their deposit money back shortly after the projected First Closing date rather than have their funds remain in escrow for an additional twelve (12) months.  Such an offer could be a powerful inducement to prospective purchasers.  There is nothing inherently unreasonable, let alone absurd or illegal as Sponsor suggests, in making such an offer.

(Determinations at 12-13.)  This line of reasoning thus sets forth the remarkable proposition that in resolving an escrow dispute based on the language of a contract, the Attorney General may put aside both what the parties to the contract in fact intended and the facts of the real world, and

instead ask whether there is a "conceivable" world in which the contract language "could" be reasonable. No such proposition can properly govern.

146.    In addition to the clear legal error inherent in the Attorney General's decision to reduce the question of the parties' actual intent to a secondary consideration, the Office's analysis does not do justice to CRP/Extell's argument below.

147.    CRP/Extell contended that where the sponsor controls the drafting of the offering plans, and where the sponsor is obligated to provide for and disclose the purchaser's right of rescission if the first closing is delayed by more than one year after the projected date, and where the sponsor has repeatedly stated in the offering plan that it makes no guarantee that the first closing would occur by the exact projected date, it would not make any sense for the sponsor then to provide the purchaser with a money-back guarantee if the first closing did not occur within a single day of the projected date.

148.    The Attorney General's resort to a hypothetical world thus not only failed for the absence of any extrinsic evidence, as shown above, but also ignored the fundamental point that in such a hypothetical world, as also noted, a sponsor would not have repeatedly emphasized its inability and unwillingness to promise a first closing by the projected date.

149.    In repeatedly and ultimately treating as dispositive the indisputable fact that the Offering Plan does state "September 1, 2008" to be the rescission date, the Attorney General ignored the searching contractual analysis that the law requires. The Attorney General framed this approach most clearly when it stated flatly (at 13) that "the issue is not what the Attorney General might know from his Office's review of numerous offering plans, but rather what this Sponsor stated in its Offering Plan."

150.    The theme is repeated throughout the Determinations, where the Attorney General states, as examples, that "the September 1, 2008 date appears in the Offering Plan prepared by Sponsor and its counsel" (Determinations at 5); that "September 1, 2008 is the date Sponsor specified in the Offering Plan (id. at 6); that the "Provision here states a set deadline and a contemporaneous consequence for Sponsor's failure to meet that deadline" (id. at 9); that the provision "unambiguously states that if the First Closing does not occur by September 1, 2008, Sponsor will offer rescission" (id. at 12); and that "Sponsor wrote in a specific date on which rescission would be offered, without qualification" (id. at 15).

151.    In determining what relief to afford the Purchasers, the Attorney General again far exceeded what the parties could have intended.  Consistent with the requirements of the regulations, any right of rescission to which the Purchasers might have been entitled would have given them fifteen (15) days from their notice of the missed deadline, to be provided by CRP/Extell, to decide whether to rescind their Purchase Agreements.  In its Determinations, however, the Attorney General evidently deemed each Purchaser to have exercised its right of rescission upon the filing of its application – regardless of the amount of time between that application and the time when the Purchaser had received notice that the first unit in the building had not closed on September 1, 2008.  In many instances, the time between the receipt of such notice and the filing of the application was many months or more.  One fundamental problem with the Determinations therefore is that they permitted the Purchasers to do precisely what the fifteen-day window is designed to prevent them from doing – namely, wait to decide whether to exercise a right of rescission based on unfolding market conditions, how those conditions might affect the market value of the unit at issue, and whether the passage of time was making it less advantageous to the Purchaser to follow through on the promises of its Purchase Agreement.

152.    In addition, the Attorney General acted arbitrarily and capriciously in deeming rights of rescission to have been exercised upon the filing of the applications. Such a solution does not reflect the requirements of the regulations nor the intent of the parties. There is no correlation at all between the time a Purchaser filed its application and the time when it received notice that the first closing in a unit had not closed by September 1, 2008. It is simply arbitrary for the Attorney General to have afforded some Purchasers many months in which to decide whether to exercise their right of rescission. The only reasonable relief would have been either to have deemed a Purchaser to have exercised its alleged right of rescission only if it had done so within fifteen days of learning of the missed deadline, or to use the date of the Determinations as the triggering date for the fifteen-day window.

153.    Considered together, and notwithstanding the Attorney General's efforts to suggest otherwise by addressing some of the relevant precedent, the foregoing statements and decisions reflect what was ultimately the Office's policy-based decision to subvert any consideration of the parties' actual intent by applying a standard of strict liability, binding sponsors to the rescission date typed into the offering plan regardless of how the law of contract interpretation, scrivener's error, mistake, and reformation operate.

154.    Indeed, the Attorney General's dismissal of what it "might know" from having reviewed other plans undercuts any suggestion that if there had been extrinsic evidence before it, the Office might have reached a different decision. The Attorney General made perfectly clear that it was adopting a policy of holding a sponsor to the rescission date typed into the offering plan. The Attorney General's approach exemplified how the relevant regulations, which impose absolutely no restrictions on the grounds on which the office makes "determinations," exceed the statute authorizing the office to implement such regulations.

## FIRST CAUSE OF ACTION

### (Fourteenth Amendment of the United States Constitution)

155.    Plaintiff re-alleges paragraphs 1 through 155 above as if fully set forth herein.

156.    The Fourteenth Amendment prohibits the States from making or enforcing any law that deprives "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1.

157.    In relevant part, the regulations here unconstitutionally permit the Attorney General to deprive persons of property without due process of law.

158.    The Attorney General's authority to make "determinations" concerning disputes over down payments in escrow affects significant private interests.  In absolute terms, the amounts of money paid in the escrow accounts under the regulations may be millions of dollars. In addition, in relative terms, such monies may constitute a significant percentage of a purchaser's liquid assets, and, particularly in the aggregate, a significant percentage of the money a real-estate developer needs to continue to operate the building at issue.

159.    Under the regulations, the risk of an erroneous deprivation of the right of a participant in such a dispute to such monies is high.  The regulations provide no framework at all to ensure that in making "determinations" to resolve "disputes" concerning escrow funds, the Attorney General will follow any particular process nor apply any particular considerations.  In the case where the parties' intent under a purchase agreement should resolve the question of how the escrow funds should be released, the regulations provide no assurance that the Attorney General can or will resolve the dispute based on the parties' intent, rather than based on other factors or standards that cannot be ascertained from the regulations.

160.    The regulations also lack any reasonable basis for permitting purchasers to go to court to litigate their disputes with sponsors concerning escrowed down payments, but requiring sponsors to present such disputes to the Attorney General.  Similarly, the regulations provide no guidance or limitation as to whether the Attorney General will exercise the discretion that the Office regards itself as having with respect to whether to resolve such a dispute itself or have the parties proceed to court if they want to have the dispute resolved.

161.    The probable value of regulations that provide at least some framework, guidance, and limitation on the Attorney General's unbridled discretion to resolve such disputes is high.  If the regulations were to provide that the Attorney General should make the parties' intent under a purchase agreement the governing consideration in determining whether and how to release funds in escrow, and were to require the Office to undertake some discovery to determine the parties' actual intent in instances where it is alleged that the agreement reflects a scrivener's error or mistake or where the agreement is ambiguous, and were to require the Office to permit the parties some discovery of each other to uncover evidence of the parties' actual intent, then the regulations would be much more likely to lead the Office to resolve the question consistent with the appropriate standard.

162.    Similarly, if the regulations were to treat purchasers and sponsors equally and give them both the option of going to court to resolve a dispute concerning escrowed down payments, rather than permitting only purchasers to go to court to litigate such disputes and requiring sponsors to submit such disputes to the Attorney General, then the regulations would not draw an unreasoned distinction that unfairly deprives one group of parties of its ability to go to court (and thus obtain discovery) in the first instance if it so chooses.  By drawing such an

unreasoned distinction, the regulations give purchasers control over whether sponsors like CRP/Extell can take discovery to support their positions.

163.    The fiscal and administrative burdens that such regulations would entail for the Attorney General are small.  In most disputes, the purchase agreement at issue does not contain a material scrivener's error.  In the instances where the Attorney General does need extrinsic evidence to determine the parties' intent and decide the claims in accordance with the operative legal standards, moreover, the discovery the parties take of each other should be an adequate substitute for any discovery the Office is authorized to take itself through subpoenas.  In permitting the parties to the dispute to take discovery of each other, the Attorney General assumes virtually no fiscal or administrative burden at all.

164.    The frequency and volume of subpoenas and depositions the Attorney General might itself issue and take are not significant burdens, in particular relative to the scope of the Office's obligations.  And in the event that there was a fiscal or administrative burden that would result from such discovery where appropriate, the Attorney General could decline to resolve the dispute and permit the parties to have the dispute resolved in court.

165.    The regulations, as noted, set forth no ascertainable standards at all with respect to what factors the Attorney General will consider in making its decision.  The regulations provide no fair warning of the criteria by which a given determination will be made.

166.    When governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have been traditionally associated with the judicial process.  The regulations do not require the Attorney General to employ any such procedures.

167.    Where discovery is among the procedures which have been traditionally associated with the judicial process, discovery must be granted in an administrative proceeding if in the particular situation a refusal to do so would so prejudice a party as to deny him due process.  Such discovery was required here.

168.    It is only with respect to those provisions of Section 352-e of the GBL under which the Attorney General is not empowered to make binding factual determinations of a judicial nature that the use of process associated with the judicial process is unnecessary.  Where the Attorney General is doing more than conducting a preliminary investigation, where the Office is making a factual determination that is final and binding, the fuller scope of judicial, procedural protections are constitutionally required.

169.    In addition, in affording a party its specific right of the opportunity to be heard, an agency must afford the participant at least the right to confirm the existence of evidence which would support a determination the agency may make, as well as the right to examine that evidence and a meaningful opportunity to refute it.

170.    The private interests at issue with respect to the Determinations are significant. The property of which the Attorney General deprived CRP/Extell includes the down payments made under the Purchaser Agreements, which total over $16 million, and the aggregate value of the property at issue under the Purchase Agreements is over $110 million.

171.    The extent of the error arising from the Attorney General's application of the regulations in this instance is significant.  The Attorney General failed to permit CRP/Extell to collect all the evidence in its favor to support its arguments under the New York law of contracts on which the Office purported to rely.

172.    The Attorney General did not permit the parties to take any discovery, and a sponsor such as CRP/Extell is not otherwise permitted under the statutes and regulations to take discovery of the purchasers or third parties.

173.    The value of additional procedural safeguards the Attorney General could have afforded CRP/Extell is high.  If the Attorney General had given CRP/Extell the opportunity to take discovery of the Purchasers and third parties the evidence obtained would have permitted CRP/Extell to demonstrate that the parties did not intend to provide Purchasers the right to rescind their Purchase Agreements and have their deposits refunded to them if the first closing of title on a unit in The Rushmore did not take place within a single day of the projected date of September 1, 2008.

174.    Accordingly, Plaintiff respectfully requests that, pursuant to 28 U.S.C. § 2201, the Court declare that, in relevant part, Plaintiff has not been afforded due process of law with respect to the Attorney General's Determinations.

## SECOND CAUSE OF ACTION

### (Invalidity of the Regulations Under New York State Constitution)

175.    Plaintiff re-alleges paragraphs 1 through 175 above as if fully set forth herein.

176.    Article III, Section 1 of the New York Constitution precludes a state agency from acting in excess of the authority of the statute that the agency is authorized to implement.

177.    Section 352-e authorizes the Attorney General "to adopt promulgate, amend and rescind suitable rules and regulations to carry out the provisions" of the Section, "including . . . determining when escrow funds may be released, the nature of escrowees, and other terms and conditions relating thereto deemed necessary in the public interest."

178.    The regulations the Attorney General has promulgated pursuant to the foregoing statute provide only that in the event a dispute arises regarding a down payment in escrow, "the sponsors shall apply and the purchaser or the escrow agent holding the down payments in escrow may apply to the Attorney General for a determination on the disposition of the down payment and any interest earned thereon." 13 N.Y.C.R.R. § 20.3(o)(3)(viii)(a).

179.    Section 352-e thus does authorize the Attorney General to implement regulations pursuant to which the Office can resolve disputes concerning the foregoing down payments in escrow.  Yet the regulations the Attorney General came to promulgate permit the Attorney General to resolve disputes concerning escrowed down payments on any grounds the Attorney General may determine to be appropriate, including based on considerations other than the law of contracts that pertain to the contracts governing those payments.

180.    In failing to set forth any parameters at all over the grounds on which the Attorney General is authorized to resolve disputes concerning escrow accounts, the regulations do not qualify as "suitable" under Section 352-e.  The regulations therefore permit the Attorney General to act in excess of the statute that the Office is authorized to implement.

181.    Similarly, in permitting purchasers to go to court to litigate their disputes with sponsors concerning escrowed down payments (and to obtain discovery), but requiring sponsors to present such disputes to the Attorney General, the regulations do not qualify as "suitable" under Section 352-e.

182.    The Attorney General's Determinations illustrate this fundamental problem, where notwithstanding the Office's task of interpreting the Purchase Agreements and purportedly relying on the relevant New York law to do so, the Determinations turn on policy-

based considerations that underscore that the regulations at issue here improperly permit the Attorney General to act in excess of the statute that he is authorized to implement.

183.    Accordingly, Plaintiff respectfully requests that, pursuant to 28 U.S.C. § 2201, the Court declare that with respect to the Determinations here, the Attorney General has acted in excess of the authority of the enabling statute, in violation of the New York Constitution.

## THIRD CAUSE OF ACTION

### (Article 78 Challenge to the Determinations)

184.    Plaintiff re-alleges paragraphs 1 through 184 above as if fully set forth herein.

185.    Article 78 of New York's Civil Practice Law and Rules ("CPLR") supersedes the common-law writs of mandamus, prohibition, and certiorari to review, creating a device for challenging the activities of an administrative agency in court.

186.    Under CPLR § 7803, a party to a New York administrative proceeding is entitled to reversal where the "determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious."

187.    The federal courts may exercise supplemental jurisdiction over a claim in federal court brought under Article 78 of the CPLR.

188.    The determinations here, as set forth above, were affected by errors of law and were otherwise arbitrary and capricious.

189.    The errors of law included the Attorney General's misapprehension of the New York law of contracts, pursuant to which a fact-finder must consider the extrinsic evidence of the parties' intent in considering whether the contract at issue reflects a scrivener's error or mistake and thus warrants reformation.

190.    The errors of law also included the Attorney General's decision not to prove and determine the parties' actual intent, as if such intent were somehow a secondary consideration, and instead to apply policy-based considerations in its Determinations.

191.    The Attorney General acted arbitrarily and capriciously by failing to consider important aspects of the issue before it, and by overlooking important considerations.

192.    The Attorney General also acted arbitrarily and capriciously in considering only a random, limited subset of the extrinsic evidence that bears on the parties' actual intent under the Offering Plan and Purchase Agreements.

193.    The Attorney General also acted arbitrarily and capriciously in drawing from the limited extrinsic evidence it did consider only those inferences that favor the Purchasers.  The Attorney General also acted arbitrarily and capriciously with respect to the particular relief it granted based on its analysis of the materials at issue.

194.    Accordingly, where the Determinations here are affected by errors of law, and are otherwise arbitrary and capricious, the Court should reverse the Determinations on terms consistent with the Court's disposition of Plaintiff's other claims.

## FOURTH CAUSE OF ACTION

### (Reformation of the Offering Plan and Purchase Agreements)

195.    Plaintiff re-alleges paragraphs 1 through 195 above as if fully set forth herein.

196.    Under the law of reformation of contract, where the words used in a contract do not reflect the parties' actual intent thereunder, the court may change the language of the contract to reflect the parties' intent.

197.    The Offering Plan here sets forth an estimated date of first closing of title (September 1, 2008) that does not reflect CRP/Extell's intent as the drafter of the Offering Plan

and does not reflect the parties' intent under the Purchase Agreements that incorporate the Offering Plan.

198.    The parties actually intended the foregoing date to be September 1, 2009, as required by the operative regulations.

199.    Accordingly, the Court should reform the Offering Plan and Purchase Agreements to reflect the intent of the parties to set forth the foregoing date as September 1, 2009.

## FIFTH CAUSE OF ACTION

### (Breach of Contract)

200.    Plaintiff re-alleges paragraphs 1 through 200 above as if fully set forth herein.

201.    Under New York law, where, in exercising their asserted right of rescission, Purchasers possessed the motivation of forcing CRP/Extell to lower the purchase price that the parties had agreed to in their respective Purchase Agreements, the Purchasers have violated the implied covenant of good faith and fair dealing inherent in the Purchase Agreements.

202.    The covenant of good faith and fair dealing is implied in every contract.  Under the covenant, in exercising its discretionary rights under a contract, a party is not permitted to exercise such a right in bad faith or for illegitimate purposes.

203.    Such bad faith or illegitimate purposes include conduct that was not within the reasonable contemplation of the parties at the time of contracting, that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

204.    At the time of entering into a given Purchase Agreement, CRP/Extell and the purchaser did not contemplate that the purchaser would have the right to rescind the Agreement based on a downturn in the economy and a drop in the value of the real estate.  The right to rescission was essentially grounded in the prospect that the purchaser had acquired a unit in a

condominium building that either was over budget or behind schedule, and therefore was not as attractive a building as had been advertised and promoted in the Offering Plan. That is not the scenario that has prompted the Purchasers here to exercise their asserted rights of rescission. In addition, CRP/Extell has substantially performed its contractual obligations.

205.   The Purchasers have thus exercised their asserted right of rescission in bad faith and for illegitimate purposes, and therefore have breached the implied covenant of good faith and fair dealing in their Purchase Agreements.

206.   As a result of Purchasers' breaches, CRP/Extell has been damaged in an amount to be proven at trial, including but not limited to, the loss of more than $16 million of Purchasers' down payments being held in escrow by Strook & Strook & Lavan LLP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants and asks the Court for an order imposing the following relief:

1.      Pursuant to 28 U.S.C. § 2201, declaring that under the Fourteenth Amendment of the United States Constitution, Plaintiff has not been afforded due process of law with respect to the Attorney General's Determinations here.

2.      Pursuant to 28 U.S.C. § 2201, declaring that under Article III, Section 1 of the New York Constitution, with respect to the Determinations here, the Attorney General has acted in excess of the authority of the enabling statute;

3.      Pursuant to Article 78 of New York's CPLR, reversing the Attorney General's Determinations here on terms consistent with the Court's disposition of Plaintiff's other claims, and permitting the down payments at issue to remain in escrow;

4.      Pursuant to the law of contracts in New York, reforming the Offering Plan and Purchase Agreements to reflect the intent of the parties to have given the Purchasers a right of rescission that would have been triggered if the first closing of title in the condominium did not take place before September 1, 2009;

5.      Pursuant to the law of contracts in New York, awarding damages for breach of contract in an amount to be determined at trial;

6.      Pursuant to the Purchase Agreements, awarding legal fees and costs incurred by CRP/Extell in connection with defending its rights under those Agreements;

7.      Pursuant to all of the foregoing authority, entering a temporary restraining order precluding the release of the escrowed down payments at issue, which otherwise the escrow agent would be obligated to release on May 12, 2010; and thereafter entering a preliminary

injunction precluding the release of the escrowed down payments pending the disposition of Plaintiff's claims herein;

        8.      Pursuant to all of the foregoing authority, entering an injunction precluding the escrow agent from releasing the escrowed down payments to Purchasers;

        9.      Pursuant to all of the foregoing authority, entering an injunction precluding the Purchasers from exercising any right of rescission based on the fact that the first closing of title in the building did not occur prior to September 1, 2008; and

       10.     Granting such other and further relief as this Court may deem just and proper.

Dated:        May 10, 2010
                Armonk, New York

                                      Respectfully submitted,
                                      BOIES SCHILLER & FLEXNER LLP

                                    By: _____
                                    Edward Normand
                                    Katherine Eskovitz
                                    Jason Cyrulnik
                                    333 Main Street
                                    Armonk, NY 10504
                                    (914) 749-8200

                                    *Attorneys for Plaintiff*