# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CRP/EXTELL PARCEL I, L.P.,

Plaintiff,

v.

ANDREW M. CUOMO, in his capacity as THE
ATTORNEY GENERAL OF THE STATE OF NEW
YORK; STROOCK & STROOCK & LAVAN LLP; 3to4,
LLC; ARC CHINISH RE LLC; ATLANTIC NYC
INVESTMENTS LLC; PARKER BAGLEY and JULIE
BAKER; BINCUBE PARTNERS; BRSP REALTY, LLC;
CHRISTOPHER A. CHANG and MARIA WU; MARK
CHU and NANCY CHAN; ONA COLASANTE;
MELINDA EVERETT and GERARD MILLIGAN;
JESSICA FAIETA; MAX GILANI; BENJAMIN
GOLDSHLAGER; KENNETH GOODMAN and
ANDREA ECONOMOS; KENNETH GOODMAN and
LYDIA GOODMAN; LOLA GUSMAN; GARY
HUANG and EVELYN HUANG; JANICE HUFF-
DOWDY and WARREN DOWDY; GYOO GWAN KIM
and SU JIN KIM; KYUNG KIM and HENRY
MYUNGHWAN KIM; MELISSA KO and S. DOUGLAS
HAHN; GAIL S. LANDIS and R. VICTOR
BERNSTEIN; BENJAMIN W. LAU and JUDITH T.
LAU as trustee for the LAU FAMILY TRUST and
designated Subtrusts thereof; GREGORY LEE; SEUNG
MOH LEE; HALEY LIEBERMAN BINN; DIANE
LIEBERMAN and LISA GINSBURG; ALBERT L.
MARINO and BETH F. HINNEN; ALAN MEYERS and
EVELYN MEYERS; TREVOR MORAN; MARLA C.
MUNS and KIMBERLY MCNEESE; MITCHELL E.
NEWMAN; HYUN KYU PARK and DOJA SONG;
PHILIP and GLENNIS POLITZINER; SHIRLEY
ROMIG and NICHOLAS ROMIG; MICHAEL
SALERNO; PAULINE SHENDER and ALEX
SHENDER; EDWARD M. SOLOMON and BARBARA
SOLOMON; HAN SOON YOM; and PIL YOON and
YOUNG YOON,

Defendants.

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY
RESTRAINING ORDER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 4

   I.   THE ATTORNEY GENERAL'S RELEVANT AUTHORITY ........................................ 4

   II.   THE OFFERING PLAN, PURCHASE AGREEMENTS, AND APPLICATIONS ......... 5

   III.   THE PURCHASERS' MOTIVATION .................................................................... 8

   IV.   THE ATTORNEY GENERAL'S DETERMINATIONS .......................................... 9

   V.   THE ATTORNEY GENERAL'S PROCEDURAL APPROACH
       TO EXTRINSIC EVIDENCE ............................................................................... 10

   VI.   THE ATTORNEY GENERAL'S CONSIDERATION OF CONTRACT LAW ............. 11

   VII.   THE ATTORNEY GENERAL'S CONSIDERATION OF
        THE OFFERING PLAN AND SOME EXTRINSIC EVIDENCE ................................ 12

   VIII. THE ATTORNEY GENERAL'S POLICY-MAKING ................................................ 13

LEGAL STANDARD ......................................................................................................... 16

ARGUMENT ..................................................................................................................... 17

   I.   CRP/EXTELL FACES THE LIKELIHOOD OF IRREPARABLE INJURY ................. 17

       A.     The Parties Could Not Be Returned to Their Current Positions. .......................... 17

       B.     CRP/Extell Seeks the Same Temporary and Final Relief. .................................... 20

   II.   CRP/EXTELL IS LIKELY TO SUCCEED ON THE MERITS ................................. 22

       A.     CRP/Extell Did Not Receive Due Process of Law. .............................................. 23

             1.     The Supreme Court's Balancing Test. ..................................................... 23

                  a.     Significant Private Interests. ....................................................... 23

                  b.     High Risk of Error. ...................................................................... 24

c.    High Probable Value of Some Safeguards....................................25

d.    Minimal Fiscal or Administrative Burdens..................................25

2.    Specific Constitutional Standards Governing Agencies. .........................26

a.    Ascertainable Standards.................................................................26

b.    Adjudicative Determinations. ........................................................27

c.    Discovery for Adjudicative Determinations. ...............................28

3.    The Determinations Under the Regulations...............................................29

B.    The Determinations Exceeded the Attorney General's Statutory Authority. .......32

1.    The "Message" the Attorney General Decided to Send...........................33

2.    The Hypothetical Real-Estate Market.......................................................35

3.    The Singular Reliance on the Type-Written Date.....................................36

C.    The Determinations Should Be Reversed Under Article 78................................37

1.    The Attorney General Committed Errors of Law in
Failing to Collect and Consider Extrinsic Evidence. ...............................38

a.    Reformation for Mistake or Scrivener's Error.............................39

b.    Conflicting and Ambiguous Contractual Provisions. ..................42

2.    The Attorney General Committed Errors of Law in
Its Interpretation of the Terms of the Offering Plan. ...............................43

3.    The Attorney General Acted Arbitrarily and Capriciously in
Its Consideration of the Limited Extrinsic Evidence...............................45

D.    CRP/Extell Is Entitled to Reformation of the Offering Plan. .............................50

E.    The Purchasers Have Breached the Implied Covenant of Good Faith and Fair
Dealing in the Purchase Agreements. ..................................................................51

III.    THE BALANCE OF HARDSHIPS FAVORS CRP/EXTELL .......................................52

CONCLUSION...................................................................................................................54

# TABLE OF AUTHORITIES

## Cases

160 W. 87th St. Corp. v. Lefkowitz,
76 Misc. 2d 297, 350 N.Y.S.2d 957 (Sup. Ct. N.Y. County 1973) ............................ 27, 28

AIM Int'l Trading, LLC v. Valcucine SpA.,
188 F. Supp. 2d 384 (S.D.N.Y. 2002)............................................................ 16

Albany Sav. Bank, FSB v. Halpin,
117 F.3d 669 (2d Cir. 1997)..................................................................... 42

Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.,
No. 04CIV10014PKL, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005) ........................... 39

Bank of Crete v. Koskotas,
No. 88 CIV. 8412, 1988 WL 140877 (S.D.N.Y. Dec. 19, 1988) .............................. 17, 20

Born v. Schrenkeisen,
110 N.Y. 55, 17 N.E. 339 (1888).............................................................. 40

Brenntag Int'l Chems. Inc. v. Bank of India,
175 F.3d 245 (2d Cir. 1999)..................................................................... 17

Burgin v. Office of Personnel Mgmt.,
120 F.3d 494 (4th Cir. 1997) ................................................................... 38

Chimart Assocs. v. Paul,
66 N.Y.2d 570, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986)................................... 39

Collins v. Harrison-Bode,
303 F.3d 429 (2d Cir. 2002)..................................................................... 42

Constr. Mgmt. Corp. v. Brown & Root, Inc.,
41 Misc. 2d 864, 246 N.Y.S.2d 465 (Sup. Ct. N.Y. County 1964) ................................. 38

Cooper v. Salazar,
No. 98C 2930, 2001 WL 1351121 (N.D. Ill. Nov. 1, 2001)................................... 27

Council for Owner Occupied Hous., Inc. v. Abrams,
133 Misc. 2d 574, 506 N.Y.S.2d 1014 (Sup. Ct. Albany County 1986) ......................... 32

Council for Owner Occupied Hous., Inc. v. Abrams,
    72 N.Y.2d 553, 531 N.E.2d 627 (1988).................................................................. 32

D.B. Zwirn Special Opportunity Fund v. Squire,
    164 Fed. Appx. 175 (2d Cir. 2006).................................................................. 39

Dalton v. Educ. Testing Serv.,
    87 N.Y.2d 384, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995)...................................... 51, 52

De Beers Consolidated Mines, Ltd. v. United States,
    325 U.S. 212 (1945).................................................................. 20

Drobbin v. Nicolet Instrument Corp.,
    631 F. Supp. 860 (S.D.N.Y. 1986).................................................................. 22

Elliott v. Kiesewetter,
    98 F.3d 47 (3d Cir. 1996) .................................................................. 18

Gonzalez v. Strand Condos.,
    No. 105863/04, 2007 WL 4336411 (N.Y. Sup. Ct. Nov. 13, 2007)................................. 40

Gross v. Empire Healthchoice Assurance, Inc.,
    16 Misc. 3d 1112(A), 2007 WL 2066390 (Sup. Ct. N.Y. County 2007)......................... 51

Hannah v. Larche,
    363 U.S. 420 (1960).................................................................. 27

Hart v. Blabey,
    287 N.Y. 257 (1942).................................................................. 40

Holmes v. N.Y. City Hous. Auth.,
    398 F.2d 262 (2d Cir. 1968).................................................................. 26

Hous. Auth. of County of King v. Pierce,
    711 F. Supp. 19 (D.D.C. 1989) .................................................................. 28

In re Schick,
    232 B.R. 589 (S.D.N.Y. 1999).................................................................. 40, 42

Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.,
    917 F.2d 100 (2d Cir. 1990).................................................................. 39

ISC Holding AG v. Nobel Biocare Invs. N.V.,
    351 Fed. Appx. 480 (2d Cir. 2009) ................................................................. 42

JA Apparel Corp. v. Abboud,
    568 F.3d 390 (2d Cir. 2009).................................................................... 42, 43

Lee Myles Assocs. Corp. v. Abrams,
    117 Misc. 2d 919, 455 N.Y.S.2d 983 (Sup. Ct. N.Y. County 1982) ............................... 29

Lichtenberg v. Besicorp Group Inc.,
    43 F. Supp. 2d 376 (S.D.N.Y. 1995)............................................................... 52

Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n,
    965 F.2d 1224 (2d Cir. 1992)..................................................................... 16

Lynch Corp. v. Omaha Nat'l Bank,
    666 F.2d 1208 (8th Cir. 1981) ............................................................ 18, 19, 22

Matter of E. 56th Plaza, Inc. v. Abrams,
    91 A.D.2d 1129, 458 N.Y.S.2d 953 (3d Dep't 1983) .......................................... 29

Matthews v. Eldridge,
    424 U.S. 319 (1976)............................................................................. 23

McClelland v. Andrus,
    606 F.2d 1278 (D.C. Cir. 1979) ................................................................ 28

Meier v. Brooks,
    22 A.D.2d 56 (1964) ...................................................................... 40, 41, 42

Mercer Capital Ltd. v. U.S. Dry Cleaning Corp.,
    No. 08 Civ. 05763, 2009 WL 2163598 (S.D.N.Y. July 21, 2009) .................................. 40

Mister Discount Stockbrokers, Inc. v. SEC,
    768 F.2d 875 (7th Cir. 1985) ................................................................... 28

N.Y. Civil Liberties Union v. N.Y. City Transit Auth.,
    675 F. Supp. 2d 411 (S.D.N.Y. 2009)........................................................... 27

N.Y. Land Co. v. Republic of Phil.,
    634 F. Supp. 279 (S.D.N.Y. 1986).............................................................. 18

Pitcher v. Hennessey,
    48 N.Y. 415 (1872) ................................................................................... 39

Prudential Ins. Co. of Am. v. S.S. Am. Lancer,
    870 F.2d 867 (2d Cir. 1989)..................................................................... 41

Republic of Pan. v. Air Pan. Internacional, S.A.,
    745 F. Supp. 669 (S.D. Fla. 1988) ......................................................... 18

Republic of Phil. v. Marcos,
    806 F.2d 344 (2d Cir. 1986)..................................................................... 18

RNR Enters., Inc. v. SEC,
    122 F.3d 93 (2d Cir. 1997)....................................................................... 27

Scott-Macon Secs., Inc. v. Zoltek Cos.,
    No. 06-2711-cv, 2007 WL 2914873 (2d Cir. Oct. 4, 2007) ................... 42

SEC v. Chenery Corp.,
    442 U.S. 194 (1947)................................................................................. 26

Seiden Assocs., Inc. v. ANC Holdings, Inc.,
    959 F.2d 425 (2d Cir. 1992)..................................................................... 42

Shuttlesworth v. City of Birmingham,
    394 U.S. 147 (1969)................................................................................. 26

State v. Smith,
    482 S.E.2d 124 (W.V. 1997).................................................................... 28

The U.S. Russian Inv. Fund v. Neal & Co.,
    No. 97 Civ. 1788 (DC), 1998 WL 557606 (S.D.N.Y. Sept. 2, 1998)............. 39

Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,
    60 F.3d 27 (2d Cir. 1995) ........................................................................ 52

Tonovic v. Abrams,
    124 Misc. 2d 407, 478 N.Y.S.2d 225 (Sup. Ct. N.Y. County 1983) ................. 29

U.S. Dep't of Hous. and Urban Dev. v. K. Capolino Constr. Corp.,
    No. 01 Civ. 290, 2001 WL 487436 (S.D.N.Y. May 7, 2001)........................... 18

United States v. William Savran & Assoc., Inc.,
    755 F. Supp. 1165 (E.D.N.Y. 1991) ................................................................ 18

Utica Packing Co. v. Block,
    781 F.2d 71 (6th Cir. 1986) ............................................................................. 27

Vector E. Realty Corp. v. Abrams,
    89 A.D.2d 453, 455 N.Y.S.2d 773 (1st Dep't 1982) ....................................... 23

Warner Bros. Inc. v. Dae Rim Trading, Inc.,
    877 F.2d 1120 (2d Cir. 1989)........................................................................... 16

Warner-Lambert Co. v. Northside Dev. Corp.,
    86 F.3d 3 (2d Cir. 1996)................................................................................... 21

Wisdom Import Sales Co. v. Labatt Brewing Co.,
    339 F.3d 101 (2d Cir. 2003).............................................................................. 16

Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.,
    No. 00 Civ. 8051, 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ..................... 17

Withrow v. Larkin,
    421 U.S. 35 (1975)............................................................................................ 28

**Other Authorities**

13 N.Y.C.R.R. Part 20 ............................................................................... 4, 5, 6, 33

CPLR § 5519............................................................................................................ 18

CPLR § 7803(3)....................................................................................................... 37

New York State Administrative Procedure Act § 102.............................................. 23

New York State Administrative Procedure Act § 301.............................................. 23

Plaintiff, CRP/Extell Parcel I, L.P. ("CRP/Extell"), respectfully submits this

Memorandum of Law in Support of CRP/Extell's Motion for a Temporary Restraining Order.

## <u>PRELIMINARY STATEMENT</u>

This case arises out of the Attorney General of the State of New York's unconstitutional,

legally erroneous, and otherwise arbitrary and capricious determinations to release millions of

dollars in down payments held in escrow for CRP/Extell's benefit.

On April 9, 2010, the Attorney General issued determinations ordering the return of the

more than $16 million in escrow down payments held with respect to forty condominium units

purchased in a new luxury building on Manhattan's West Side, The Rushmore, which

CRP/Extell developed.  The down payments had been placed in escrow pursuant to agreements

for the purchase of the units (the "Purchase Agreements").  The down payments were protection

for CRP/Extell pending completion of construction of The Rushmore, at which point purchasers

would be required to close on their respective units.  The Attorney General's determinations

allow the purchasers to abrogate their contractual commitments to close on the purchase of their

units, taking advantage of a significant downturn in the economy in general and in the real-estate

market in New York City in particular.

The Purchase Agreements incorporate an offering plan dated August 11, 2006, as

amended, that CRP/Extell used for the building (the "Offering Plan").  The Offering Plan

provides that the projected first year of condominium operations was September 1, 2008, through

August 31, 2009, and thus the projected date for the first closing of title to a unit in the building

was September 1, 2008.  The Offering Plan repeatedly states that CRP/Extell cannot and does

not guarantee that the first closing of title to a unit in the condominium will take place by the

projected first closing date set forth in the Plan.  As is customary in the industry, none of the

individual purchasers was guaranteed that its specific units would close by a specific date.

The operative New York State regulations require that offering plans for newly constructed condominiums include two provisions regarding the date for first closing of title to a unit in the building – (i) a provision that offers purchasers a conditional right to rescind the agreement if the first closing of title to a unit in the condominium is delayed by more than six months from the projected date for such first closing <u>and</u> the projected budget for the building increases by 25% or more; and (ii) a provision that offers an unconditional right to rescind the agreement if the first closing on a unit in the condominium is delayed by more than twelve (12) months, regardless of whether the budget increased by 25% or more.

CRP/Extell therefore included in the 757-page Offering Plan two provisions regarding the first closing of title to a unit in the building.  The first, conditional provision guaranteed purchasers that if the first closing in the building did not take place within six months of the projected first closing date (that is, by March 1, 2009) and the projected budget for the building increased by 25% or more, then purchasers would have a fifteen-day right to rescind their Purchase Agreements and have their deposits refunded to them.  Both conditions had to be met for the purchasers to have a right to rescind their Agreements.

A second, unconditional provision guaranteed purchasers that the first closing in the building would take place within one year of the projected first closing date (that is, by September 1, 2009) or else they would have a fifteen-day right to rescind their agreements.  The attorney drafting the Offering Plan mistakenly typed into that provision that the guaranteed outside first closing date was September 1, 2008, which was the same day as the projected first closing date, instead of September 1, 2009, which was one year after the projected commencement of operations date and reflects what is required by the regulations.  The date typed into the Offering Plan (September 1, 2008) is a typographical error that does not reflect the

intent of the parties; the purchasers contend, and the Attorney General has agreed, that CRP/Extell is stuck with that date.

The first closing of title to a unit in The Rushmore took place on February 12, 2009, within six months of the projected first closing date and well within the twelve-month deadline included in such offering plans and required by the operative regulations.  Yet more than five months after the projected commencement of operations date of September 1, 2008, a purchaser looking to avoid its obligations under its Purchase Agreement filed with the Attorney General an "Application for a Determination of the Disposition of Downpayments" seeking to exercise its alleged right to rescind and have its deposit refunded because the first closing of title did not take place within by September 1, 2008.

Over the next year, as the downturn in the economy and real-estate market continued, thirty-nine other purchasers filed applications with the Attorney General seeking to rescind their Purchase Agreements and to have their deposits refunded.  An attorney for many of the purchasers has admitted to the press that they filed their applications with the motivation of a "the chance to buy in at a lower price" and thus opportunistically get out from under their Agreements during the downturn.

On April 9, 2010, in a series of identical Determinations, the Attorney General granted all of the purchasers' requests on submission and without taking any evidence from the parties or conducting any hearing to determine the intent of the parties to the contract, finding that they had the right to rescind their Purchase Agreements and directing the escrow agent to release to the purchasers the down payments that they had made on their respective purchases and that were being held as security for CRP/Extell.  The value of the down payments that the Attorney General has seen fit to release to the purchasers is over $16 million, and the value of the

properties that the purchasers had purchased is over $110 million.  The Attorney General has ordered the funds to be released by May 12, 2010; they have not yet been released.

In this action, CRP/Extell seeks redress for the many critical procedural and substantive flaws in the Attorney General's determinations, and seeks to clarify and enforce the intended terms of the Offering Plan and the Purchase Agreements.  CRP/Extell alleges that (1) it did not receive due process of law under the regulations; (2) the Attorney General exceeded the authority of the statute authorizing the Office to implement regulations in this area; (3) the determinations are affected by errors of law, and are otherwise arbitrary and capricious, and therefore warrant reversal under Article 78 of the New York Civil Practice Law and Rules; (4) CRP/Extell is entitled to reformation of the Offering Plan to reflect the parties' actual intent thereunder; and (5) motivated as they were, the purchasers breached their obligations of good faith and fair dealing under the Purchase Agreements.

## **BACKGROUND**

## I.   **THE ATTORNEY GENERAL'S RELEVANT AUTHORITY**

Under Article 23-A of the New York General Business Law (the "GBL"), the Attorney General has promulgated regulations governing, among other real estate, newly constructed condominiums.  13 N.Y.C.R.R. Part 20.  Section 352-e of the GBL and the regulations thereunder authorize the Attorney General to ensure that in offering plans such as the one that CRP/Extell used here, a "sponsor" such as CRP/Extell must disclose to potential purchasers that if the first closing on a unit in the condominium does not occur within twelve (12) months of the estimated date of the first closing identified in the offering plan, then the purchaser will have the right to rescind its purchase agreement and recover the down payment it had made.  13 N.Y.C.R.R. § 20.3(o)(12).  (Complaint ¶¶ 62-63.)

Sections 352-e and 352-h provide that the down payments on condominium units must be placed into escrow accounts, and the Attorney General is "authorized to adopt, promulgate, amend and rescind suitable rules and regulations . . . determining when escrow funds may be released."  Section 352-e(2)(b).  Under the regulations the Attorney General came to promulgate, in the event a dispute arises regarding the down payment, "the sponsors shall apply and the purchaser or the escrow agent holding the down payments in escrow may apply to the Attorney General for a determination on the disposition of the down payment and any interest earned thereon."  13 N.Y.C.R.R. § 20.3(o)(3)(viii)(a).  The regulations say nothing further about the nature of such a "determination," about any procedure the Attorney General will apply, about what submissions the participants can make or the Office will consider, about the nature of any evidence the Office may consider, or about the criteria the Office may apply in resolving the determination. (Complaint ¶¶ 66-67.)

The Attorney General interprets the regulations to mean that the Office has the discretion to decline to make such a determination, and instead permit the parties to resolve their dispute in court.  The GBL authorizes the Attorney General to issue subpoenas and conduct a hearing with respect to matters under the Office's purview, but the regulations provide no guidance as to when the Office will, or must, exercise such authority with respect to determinations such as at issue here.  (Complaint ¶¶ 68-69.)

## II.     THE OFFERING PLAN, PURCHASE AGREEMENTS, AND APPLICATIONS

CRP/Extell developed The Rushmore, a newly constructed luxury condominium located at 80 Riverside Boulevard, New York, New York.  In connection with its proposed sale of units in The Rushmore, and as required by law, CRP/Extell published an Offering Plan, dated August 11, 2006, for the condominium.  The Offering Plan is 757 pages long.  CRP/Extell thereafter made many Amendments to the Plan.  In the Offering Plan, the projected first year of

5

condominium operations was September 1, 2008, through August 31, 2009.  The first closing of title to a unit took place on February 12, 2009, within the six-month conditional deadline for such first closing, and well within the one-year deadline for such first closing, imposed by the regulations.  (Complaint ¶¶ 71-74.)

The Purchasers entered into Purchase Agreements for the purchase of units in The Rushmore.  In their respective Agreements, each Purchaser agreed to purchase the unit identified therein for the purchase price set forth therein.  Purchasers agreed to provide an "Initial Deposit" and an "Additional Deposit" as down payments for their payment obligations under the Agreements.  Each Purchaser agreed to pay the balance of the purchase price upon delivery of the deed for the property it had purchased.  Closing of title for the Purchasers' respective units was scheduled to take place on specified dates.  (Complaint ¶¶ 22-60, 75.)

The amount of the down payments paid by Purchasers for the properties they had purchased is over $16 million, and the value of the properties is over $110 million.  The down payments were all placed in escrow under 13 N.Y.C.R.R. § 20.3(o) in accordance with the Offering Plan.  The escrow agent holding the down payments is the law firm of Stroock & Stroock & Lavan LLP.  None of the Purchasers secured an individual unit outside closing-date guarantee, by which CRP/Extell would guarantee that a particular Purchaser could close on and move into the specific unit it had purchased by a date certain.  (Complaint ¶¶ 76-78.)

The Purchase Agreements incorporate by reference CRP/Extell's Offering Plan.  Page 95 of the Offering Plan identifies the commencement date for the first year of operations in the condominium and contains a provision that states as follows:

> It is anticipated that the First Closing will occur by the commencement date for the First Year of Condominium Operation as set forth in Schedule B which is September 1, 2008.  If the First Closing does not occur by September 1, 2008, as such date may be

> extended by duly filed amendment to the Plan, Sponsor will amend
> the Plan to update the budgets and to offer Purchaser the right to
> rescind their agreements within fifteen (15) days after the
> presentation of the amendment disclosing the updated budget, and
> any Purchaser electing rescission will have their Deposits and any
> interest earned thereon returned.

This provision was CRP/Extell's attempt to comply with Section 20.3(o)(12), requiring CRP/Extell to grant a right to rescind if the first closing is delayed twelve (12) months beyond the anticipated commencement of the first year of operations (that is, if the first closing did not occur by September 1, 2009). Under the regulations and Offering Plan, the date of the first closing of title has no relationship to when any particular unit will be completed or will close; there is no outside closing date specified with respect to any particular unit. (Complaint ¶ 78.)

The first closing of title to a unit in The Rushmore occurred on February 12, 2009, within six months of the projected date for such closing, but after the projected date itself (September 1, 2008). CRP/Extell did not regard the projected date as the actual guaranteed deadline for such closing, and therefore did not offer any purchaser any right of rescission when the date passed. None of the Purchasers sought to rescind their Agreements within fifteen days of September 1, 2008, or otherwise requested that CRP/Extell duly file an amendment offering such right to rescind on the grounds that the first closing of title to a unit in The Rushmore did not take place on the projected first date of closing, on the basis of the foregoing provision. In fact, on September 24, 2008, CRP/Extell published an amendment to the Offering Plan reiterating that the "actual first year of Condominium operation may be earlier or later" than projected, that CRP/Extell made no guarantees regarding such date, and that if the actual date of first closing of title is delayed by more than six months from the projected date, purchasers will have the right to rescind their agreements only if the budget for condominium operations increases by 25% or more. Having received that amendment, not a single Purchaser responded by claiming that

CRP/Extell was obligated to offer a right of rescission. Indeed, no Purchaser even inquired about such a possibility. (Complaint ¶ 139.)

On February 23, 2009, over five months after September 1, 2008, Purchaser ARC filed with the Attorney General an Application for a Determination of the Disposition of Downpayments, seeking to rescind its Purchase Agreement on the ground that the first closing of title had not taken place on September 1, 2008. Over the next year, as the downturn in the economy and real-estate market continued, the other Purchasers filed similar applications with the Attorney General. Purchasers argued in support of their applications that CRP/Extell should be bound by the date of September 1, 2008, as typed into the Offering Plan. CRP/Extell argued in opposition (and in support of its own cross-application regarding the down payments) that the September 1, 2008, date was a scrivener's error and mistake that did not reflect the parties' actual intent, and therefore that CRP/Extell is entitled to seek reformation of the Offering Plan. (Complaint ¶¶ 80-83.)

The Attorney General declined to have the determinations be made by a court of law, where CRP/Extell could take discovery and present the extrinsic evidence uncovered therein concerning the intent of the parties, and decided to determine whether to order release of the $16 million in escrow funds on submission of papers. (Complaint ¶ 84.)

## III.   THE PURCHASERS' MOTIVATION

The Purchasers chose to exercise their asserted rights of rescission following a significant downturn in the economy in general and in the real-estate market in New York in particular. If they can rescind their Purchase Agreements, the Purchasers will succeed in avoiding the obligation to complete their payments on real estate in a depressed market. (Complaint ¶ 85.)

If there were any doubt about the Purchasers' motivation in exercising their asserted rights of rescission, the attorney for thirty of the Purchasers made the issue crystal clear when he

admitted in a July 2009 article in <u>The New York Times</u> that many Purchasers filed their application because they were hoping for "the chance to buy in at a lower price" and thus opportunistically pass off to CRP/Extell the risk that the Purchasers had assumed in entering into their Agreements prior to the decline in the market.  (Complaint ¶ 86; Declaration of Ahuva Genack dated May 10, 2010 ("Genack Decl.") ¶ 17.)

In contracting, CRP/Extell and the Purchaser did not contemplate that the Purchaser would have the right to rescind the Agreement based on a downturn in the economy and a drop in the value of the real estate the Purchaser had acquired.  The right to rescission was essentially grounded in the prospect that the Purchaser had acquired a unit in a condominium that either was over budget or behind schedule, and therefore was not as attractive a building as had been advertised and promoted in the Offering Plan.  That is not the scenario that has prompted the Purchasers here to exercise their asserted rights of rescission.  (Complaint ¶ 204.)

## IV.    THE ATTORNEY GENERAL'S DETERMINATIONS

On April 9, 2010, the Attorney General issued its determinations that the rescission date of September 1, 2008, as typed into the foregoing provision of the Offering Plan, binds CRP/Extell.  The Attorney General has directed the escrow agent to release the down payments by May 12, 2010.  The escrow agent has not yet released the funds.  (Complaint ¶ 86.)

The Attorney General thus gave all Purchasers the unconditional right to rescind their Purchase Agreements, even though none of the Purchasers had sought to exercise such right within fifteen days of September 1, 2008, or even within five months of that date.  The Attorney General directed CRP/Extell to offer Defendant Gilani the unconditional right to rescind his Purchase Agreement, for example, where he did not seek to exercise his alleged right to rescind until January 2010 – more than fifteen months after September 1, 2008.  (Complaint ¶ 88.)

The primary bases for the Determinations, as set forth in further detail below, were that CRP/Extell had presented "no evidence" that the parties intended a rescission date other than September 1, 2008; that the integration clause in the Purchase Agreement might preclude consideration of parol evidence even where a claim of scrivener's error is asserted; that the Offering Plan unambiguously identifies September 1, 2008, as the rescission date; that there is no ambiguity within the Offering Plan as a whole as to whether a purchaser would have a money-back guarantee if the first closing did not occur by September 1, 2008; that in a hypothetical "highly competitive" real-estate market, it would make sense for a sponsor like CRP/Extell to give purchasers an immediate right of rescission if the first closing of title occurred even a single day after the estimated date of first closing; that by its reading of some extrinsic evidence, CRP/Extell sometimes might guarantee a first closing of title to take place prior to the full year after the estimated date of first closing that is required; that the parties' course of conduct under the Offering Plan and Agreements was "beside the point"; and that declining to enforce the rescission date typed into the Offering Plan would "send the wrong message" to sponsors or purchasers, or both.  (Complaint ¶ 89; Genack Decl. ¶ 36.)

## V.  THE ATTORNEY GENERAL'S PROCEDURAL APPROACH TO EXTRINSIC EVIDENCE

The Attorney General was first apprised of a dispute between CRP/Extell and a purchaser concerning a right of rescission on or about February 23, 2009.  In the next year, during which thirty-nine others purchasers filed applications with the Attorney General in an effort to rescind or renegotiate their agreements, the Office did not take any discovery and did not offer the parties the ability to take any discovery or cross-examine any witnesses to obtain extrinsic evidence in support of their arguments concerning the parties' intent under the Offering Plan and Purchase Agreements.  (Complaint ¶¶ 90-91.)

Instead, the Attorney General conveyed to CRP/Extell that that there would be no occasion for it to collect evidence from the Purchasers or from third parties. An attorney for the Attorney General advised CRP/Extell that with respect to these determinations, the Office would not take depositions or otherwise allow CRP/Extell to take testimony of the purchasers, and told CRP/Extell that the Office was not seeking to determine the intent the parties had in their minds when they drafted the Offering Plan or entered into the Purchase Agreements. (Complaint ¶ 92.)

Having proceeded in that fashion, in its determinations the Attorney General nevertheless acknowledged the potential relevance of extrinsic evidence and undertook to consider such evidence – but only a fraction of what it should have considered (that is, the limited body of evidence that the parties could obtain without any discovery or cross-examination of the relevant witnesses). The determinations cite the alleged failure of CRP/Extell to present extrinsic evidence in support of several of its arguments, despite the obvious limitations of CRP/Extell's ability to obtain such evidence in the absence of discovery. (Complaint ¶¶ 95-96.)

The Attorney General noted, for example, that the question of the relevance of the integration clause in the Purchase Agreement "need not be reached because no parol evidence on the subject has been presented" (Determinations at 4 n.1), but then later opined that "there is other evidence that the selection of the September 1, 2008 rescission date was not a typographical error" in light of an initial draft of the Offering Plan and language in an entirely separate offering plan (id. at 13 n.4).

## VI.   THE ATTORNEY GENERAL'S CONSIDERATION OF CONTRACT LAW

In the Determinations, the Attorney General addresses cases applying the New York law of contracts. Although the Attorney General expressed uncertainly on the issue, under that law, the Office was obligated to consider all of the relevant extrinsic evidence, but it did not. CRP/Extell reasonably expects that several related types of extrinsic evidence will shed light on

11

the parties' intent and show it to be contrary to the Determinations here.  Such evidence includes

evidence of the intent of CRP/Extell (and of its outside counsel who drafted the Offering Plan),

the intent of the Purchasers, the relevant custom and practice in this industry, and the conditions

in the relevant real-estate market as of the date of the Offering Plan.  (Complaint ¶¶ 103-04;

Genack Decl. ¶¶ 22-31.)

## VII.   THE ATTORNEY GENERAL'S CONSIDERATION OF THE OFFERING PLAN AND SOME EXTRINSIC EVIDENCE

The Attorney General decided that read in its entirety, the Offering Plan contains no

ambiguity on the question of whether the parties intended for Purchasers to have a money-back

guarantee that the first closing would occur by September 1, 2008.  The terms of the Offering

Plan, however, cannot be reasonably read to reflect the parties' intent that the Purchasers had

such a guarantee.  (Complaint ¶¶ 117-23.)

Indeed, as it turned out, the Attorney General chose to avoid the question of the parties'

actual intent.  Instead, the Determinations addressed (at 12-13) the different question of whether

in a hypothetical world it might make sense for a sponsor to provide a money-back guarantee

that the first closing would occur by the projected date for the first closing.  That is not the same

as undertaking to determine what the parties to the purchases at issue in this case actually

intended, and that is not what the law considers in interpreting the binding terms of a contract.

(Complaint ¶ 122.)

Even entertaining such a hypothetical world, moreover, the Attorney General's

interpretation is not reasonable.  In such a world, a sponsor would <u>not</u> have repeatedly

emphasized its inability and unwillingness to promise a first closing by the projected date.  There

is simply no way of reconciling the entirety of the Offering Plan with a reading of a money-back

guarantee on the September 1, 2008, date.  (Complaint ¶ 123.)  Having failed to afford

CRP/Extell the opportunity to address and explain the significance of such evidence, moreover, the Attorney General also considered a limited subset of extrinsic evidence (that is, only the evidence parties could obtain from their own files) and in construing such evidence far too narrowly.  (Complaint ¶¶ 124-40.)

## VIII.  THE ATTORNEY GENERAL'S POLICY-MAKING

Athough the determinations cite New York law, they ultimately turn on policy-based considerations, in several respects.  (Complaint ¶ 141.)

The Attorney General expressly based its conclusion on what "message" should or should not be sent about the statements in sponsors' offering plans.  Seeking to distinguish one case, and then setting forth the culmination of its analysis of "Scrivener's Error, Mistake and Reformation," the Attorney General stated:

> Here, by contrast, no document has been presented that contradicts the Offering Plan or provides a different rescission date.  Nor has Sponsor presented any evidence of any other communications or representations that would have put purchasers, who signed Offering Plans months, and in many cases, over a year before September 1, 2008, on notice that Sponsor meant 2009 when it wrote 2008 in the Offering Plan.  To allow Sponsor in these circumstances to change the Offering Plan and apply it retroactively would send the wrong message about the importance of statements made by sponsors in offering plans.

(Determinations at 8-9.)  This statement thus reveals the policy-based linchpin of the Attorney General's analysis – that if the Office were properly to apply New York law to interpret an Offering Plan to provide for a rescission date other than the date typed into the offering plan, then the Office would be sending the "wrong message."  The right "message" presumably is that the plain language in offering plans is important and that purchasers are entitled to rely on it. (Complaint ¶ 142.)

The Attorney General later adopted a further standard that is apparently designed to protect and benefit purchasers.  Confirming that its conclusions did not turn on its view of what the parties actually intended, and then expanding on the point, the Attorney General stated:

> As noted, the Attorney General will not rewrite an Offering Plan because Sponsor now contends that its Offering Plan – whether intentionally or not – was more generous to purchasers than the law requires.  It is entirely conceivable that a seller in a highly competitive marketplace might offer an opportunity for purchasers to get their deposit money back shortly after the projected First Closing date rather than have their funds remain in escrow for an additional twelve (12) months.  Such an offer could be a powerful inducement to prospective purchasers.  There is nothing inherently unreasonable, let alone absurd or illegal as Sponsor suggests, in making such an offer.

(Determinations at 12-13.)  This line of reasoning thus sets forth the remarkable proposition that in resolving an escrow dispute based on the language of a contract, the Attorney General may put aside both what the parties to the contract in fact intended and the facts of the real world, and instead ask whether there is a "conceivable" world in which the contract language "could" be reasonable.  (Complaint ¶ 145.)

Similarly, in repeatedly and ultimately treating as dispositive the indisputable fact that the Offering Plan does state "September 1, 2008" to be the rescission date, the Attorney General ignored the searching contractual analysis that the law requires.  The Attorney General framed this approach most clearly when it stated (at 13) that "the issue is not what the Attorney General might know from his Office's review of numerous offering plans, but rather what this Sponsor stated in its Offering Plan."  The theme is repeated throughout the Determinations, where the Attorney General states, as examples, that "the September 1, 2008 date appears in the Offering Plan prepared by Sponsor and its counsel" (Determinations at 5); that "September 1, 2008 is the date Sponsor specified in the Offering Plan (id. at 6); that the "Provision here states a set

14

deadline and a contemporaneous consequence for Sponsor's failure to meet that deadline" (id. at 9); that the provision "unambiguously states that if the First Closing does not occur by September 1, 2008, Sponsor will offer rescission" (id. at 12); and that "Sponsor wrote in a specific date on which rescission would be offered, without qualification" (id. at 15). (Complaint ¶¶ 149-50.)

In determining what relief to afford the Purchasers, moreover, the Attorney General again far exceeded what the parties could have intended.  Consistent with the requirements of the regulations, any right of rescission to which the Purchasers might have been entitled would have given them fifteen (15) days from their notice of the missed deadline, to be provided by CRP/Extell, to decide whether to rescind their Purchase Agreements.  In its Determinations, however, the Attorney General evidently deemed each Purchaser to have exercised its right of rescission upon the filing of its application – regardless of the amount of time between that application and the time when the Purchaser had received notice that the first unit in the building had not closed on September 1, 2008.  In many instances, the time between the receipt of such notice and the filing of the application was many months or more.  The Determinations thus permitted the Purchasers to do precisely what the fifteen-day window is designed to prevent them from doing – namely, wait to decide whether to exercise a right of rescission based on unfolding market conditions, how those conditions might affect the market value of the unit at issue, and whether the passage of time was making it less advantageous to the Purchaser to follow through on the promises it made in its Purchase Agreement.

## LEGAL STANDARD

A court may grant a temporary restraining order to preserve the status quo before a hearing can occur on the merits of a party's preliminary injunction motion.  Warner Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1124 (2d Cir. 1989); see also AIM Int'l Trading, LLC v. Valcucine SpA., 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002) (the point "of a temporary restraining order is to preserve an existing situation *in statu quo* unit the court has an opportunity to pass upon the merits of the demand for a preliminary injunction").

"[T]he traditional standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction." Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, 965 F.2d 1224, 1228 (2d Cir. 1992).  The movant must establish "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [movant's] favor."  Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 108 (2d Cir. 2003).

16

## ARGUMENT

## I.   CRP/EXTELL FACES THE LIKELIHOOD OF IRREPARABLE INJURY

CRP/Extell faces the likelihood of irreparable injury on each of the independently sufficient grounds set forth below.[1]

### A.   The Parties Could Not Be Returned to Their Current Positions.

In related lines of precedent, the federal courts have made clear that where the funds sought to be frozen are also the funds at issue in the suit, and where the funds may be dissipated if not frozen, injunctive relief is appropriate.  The Second Circuit captured the general principle when it explained that preliminary relief may be granted "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  Brenntag Int'l Chems. Inc. v. Bank of India,175 F.3d 245, 249 (2d Cir. 1999).

This Court has repeatedly held, for example, that where the particular funds sought to be frozen are also the funds at issue in the suit, a preliminary injunction is proper.  See, e.g., Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc., No. 00 Civ. 8051, 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000) (collecting cases); Bank of Crete v. Koskotas, No. 88 CIV. 8412, 1988 WL 140877, at *3-5 (S.D.N.Y. Dec. 19, 1988).  Similarly, the possibility that without an injunction the funds that are the subject of an action will be disbursed to multiple transferees establishes the likelihood of irreparable injury.  See, e.g., U.S. Dep't of Hous. and Urban Dev. v.

---

[1]      In addition to its constitutional claim and claims under state common law, CRP/Extell brings a claim under Article 78 of New York's CPLR, for review of the errors of law, and otherwise arbitrary and capricious decisions, in the Determinations.  CRP/Extell submits that the filing of the Article 78 claim imposes an automatic stay of the relief granted in the Determinations under CPLR §§ 5519 and 7805.  At the same time, CRP/Extell acknowledges that there may be disagreement on the operation of those provisions in this context. Accordingly, in an abundance of caution, and considering that the issue of the operation of the automatic stay could not be resolved in court prior to the date on which the escrow funds otherwise would be released, CRP/Extell seeks the temporary restraining order requested herein.

K. Capolino Constr. Corp., No. 01 Civ. 290, 2001 WL 487436, at *4 (S.D.N.Y. May 7, 2001);

Lynch Corp. v. Omaha Nat'l Bank, 666 F.2d 1208, 1212 (8th Cir. 1981); see also United States

v. William Savran & Assocs., 755 F. Supp. 1165, 1180 (E.D.N.Y. 1991).

The plaintiff is not required to prove that the future inability to collect is a certainty;

rather, the possibility that property will be irretrievably dissipated "is itself sufficient to support a

finding of irreparable injury."  Republic of Pan. v. Air Pan. Internacional, S.A., 745 F. Supp.

669, 674 (S.D. Fla. 1988); see also N.Y. Land Co. v. Republic of Phil., 634 F. Supp. 279, 288

(S.D.N.Y. 1986), aff'd sub nom. Republic of Phil. v. Marcos, 806 F.2d 344 (2d Cir. 1986)

(holding that depriving plaintiff of hope of protecting claim to monies made subject to

constructive trust was sufficient finding of likelihood of irreparable injury).  "That irreparable

harm would occur absent an asset freeze is even more apparent where the very assets subject to a

potential judgment will likely be dissipated without entry of the order."  Elliott v. Kiesewetter,

98 F.3d 47, 58 (3d Cir. 1996) (party seeking asset may show irreparable injury by showing that

freeze is necessary to prevent consumption, dissipation or fraudulent conveyance of asset).[2]

CRP/Extell plainly satisfies the foregoing standards, where the down payments in escrow

are the specific funds at issue in this lawsuit; where if released, those funds will be disbursed to

multiple transferees across the country; and where releasing the escrowed funds may result in the

funds being irretrievably dissipated.  It bears emphasis that CRP/Extell is not seeking a broad

injunction freezing all of Purchasers' assets.  CRP/Extell seeks only a limited injunction to

---

[2]      New York's CPLR recognizes the prospect of irreparable injury with respect to monetary
judgments by granting an automatic stay against such a judgment upon the filing of an appeal
from such a judgment (and an appropriate undertaking by appellant).  CPLR § 5519(a)(2).  It
would be nonsensical for the law thus to provide for the preservation of the status quo on an
appeal from a formal judicial proceeding with its procedural safeguards, but not to provide a
similar preservation of the status quo upon the appeal from a determination of an agency, which
in general do not provide such safeguards, and which here provided virtually none.

maintain the status quo by keeping in escrow the specific funds that are the subject of this action and that have been in escrow as down payments on the purchase of condominium units for several years.

This case is analogous to the Eighth Circuit's decision in <u>Lynch</u>, which numerous federal courts have followed.  In that case, the escrow bank argued that Lynch had not proven the likelihood of irreparable harm because the bank was a solvent defendant capable of responding in damages.  The bank further argued that injunctive relief should not be granted simply because money may be distributed to numerous third parties, requiring a multiplicity of lawsuits to recover the money.  The court disagreed, concluding that should plaintiff succeed in the litigation, it would be forced to pursue the numerous transferees who received escrow money from the bank.  The court reasoned that "irreparable harm is established when the distribution of assets of a liquidated company before an adjudication of rescission claims would defeat and delay satisfaction of those claims if they were ultimately sustained."  <u>Lynch</u>, 666 F.2d at 1212.

In this case, if the down payments were released from escrow and CRP/Extell prevails in this litigation, CRP/Extell will suffer the unquantifiable difficulty and cost in seeking to recover those down payments at a later date – if CRP/Extell could recover them at all.  CRP/Extell may have to incur the unquantifiable cost of bringing a significant number of actions to obtain judgments against the Purchasers for the amount of the down payments, and the additional and also unquantifiable cost of enforcing those judgments.  With respect to the many Purchasers who reside outside of New York, the economic and logistical burdens that CRP/Extell would face if it were to prevail are potentially even more significant.  The Purchasers include residents of California, Florida, Indiana, Maryland, New Jersey, and Texas.  CRP/Extell may have to file actions in those states to obtain judgments against those Purchasers for the amount of the down

19

payments, and (again) the additional and also unquantifiable cost of seeking to enforce such judgments.  Indeed, the foregoing concerns are among the very reasons sponsors such as CRP/Extell require down payments to serve as security for a commitment to buy, at an agreed-upon price, without the burden and delay of litigation.  (Genack Decl. ¶¶ 36-43.)

      **B.**      <u>**CRP/Extell Seeks the Same Temporary and Final Relief.**</u>

A "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."  <u>De Beers Consolidated Mines, Ltd. v. United States</u>, 325 U.S. 212, 220 (1945); <u>see also</u> <u>Republic of the Phil.</u>, 806 F.2d at 356.  As Judge Martin reasoned in <u>Wishnatzki</u>, "where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets."  <u>Id.</u> (citations omitted); <u>accord</u> <u>Bank of Crete</u>, 1988 WL 140877, at *3-5.

The Supreme Court in <u>De Beers</u> explained the reasoning for why this rule establishes the likelihood of irreparable harm:

> In truth the purpose and effect of the injunction is to provide
> security for performance of a future order which may be entered by
> the court.  Its issue presupposes or assumes the following things:
> (1) That the court has obtained jurisdiction of the persons of the
> defendants; (2) that it may be found and adjudged that [plaintiff]
> has stated a cause of action in its complaint; (3) that a decree may
> be entered after trial on the merits enjoining and restraining the
> defendants from certain future conduct; (4) that the defendants
> may disobey the decree entered; (5) that a proceeding may be
> instituted for contempt and will result adversely to the defendants;
> (6) that a fine may be imposed; (7) that the defendants may neglect
> or refuse to pay the fine; (8) that an execution issued for the
> collection of the fine . . . may be ineffectual to seize property or
> money of the defendants in liquidation of the fine, unless the
> moneys and properties covered by the injunction are held to await
> the event.

<u>Id.</u> at 220.  The likelihood of irreparable harm is thus established where the harm cannot be prevented or fully rectified by the final judgment after trial.  <u>Id.</u>  The inquiry is whether the

plaintiff will be made whole if he prevails on the merits and is awarded damages; where harm is unquantifiable in monetary terms, the irreparable harm requirement is met.  See, e.g., Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 8 (2d Cir. 1996).

CRP/Extell meets this independently sufficient standard as well.  CRP/Extell is merely seeking intermediate relief of the same character as that which may be granted finally.  In addition to other remedies, CRP/Extell is seeking permanent injunctions to enjoin the Purchasers from rescinding their Purchase Agreements on the basis of the Determinations and to enjoin the escrow agent from executing the Attorney General's Determinations.

CRP/Extell seeks such relief because monetary relief may not make CRP/Extell whole; instead, CRP/Extell may suffer unquantifiable losses.  If the down payments remain in escrow, when faced with the choice of defaulting on their Purchase Agreements or taking possession of their units, presumably some if not all of the Purchasers will go through with their commitment to buy the units at the agreed-upon price because they would not be willing to suffer the loss of their down payments.  CRP/Extell will thus first lose the unquantifiable value of an "in-place" sale; that is, CRP/Extell faces the prospect of the unquantifiable loss of value of units in the building, resulting from Purchasers' decision not to take possession of the units they had agreed to purchase.  In addition, CRP/Extell would not be able to recover the unquantifiable amount of additional down payments that could be released if, having learned of the release of the funds at issue in this case, other purchasers who entered into Purchase Agreements prior to September 1, 2008, and have not yet closed on their units decide to claim the right to down payments that the Attorney General has given the Purchasers at issue in this case.  (Genack Decl. ¶ 43.)

CRP/Extell will also lose its unquantifiable, bargained-for right to have these down payments serve as security for a commitment to buy, at an agreed-upon price, without the burden

21

and delay of litigation.  (Genack Decl. ¶ 42.)  A monetary award after judgment will not be the

same, because CRP/Extell now has security to encourage Purchasers to take possession of the

units at the price agreed upon, without having to pursue litigation.  In <u>Lynch</u>, for example,

plaintiff argued and the Eighth Circuit agreed that the very purpose of the escrow agreement was

to provide Lynch with the security to prevent this type of harm.  666 F.2d at 1212.

Indeed, the deposit of such down payments into escrow accounts is intended to avoid

(among other potentialities) these precise forms of irreparable harm – these potentially

significant and unquantifiable economic burdens on sponsors like CRP/Extell.  The deposit of

down payments into escrow gives the sponsor security that if the purchaser fails to honor its

contractual obligations, the sponsor automatically will have economic protection without any

additional expense or delay.  (Genack Decl. ¶ 42.)  <u>See</u> <u>Drobbin v. Nicolet Instrument Corp.</u>, 631

F. Supp. 860, 912 (S.D.N.Y. 1986) ("Where a plaintiff's injury is theoretically compensable in

money damages, but as a practical matter, the defendant would not or could not respond fully for

those damages, preliminary injunctive relief has been deemed necessary to protect plaintiff from

irreparable injury."); <u>see also</u> <u>Calandro v. First Community Bank and Trust Co. of Lone Grove,</u>

<u>Oklahoma</u>, 991 F.2d 640, 643 (10th Cir. 1993) (escrow agreement can be critical component of a

sales program "designed to give some sense of security" to the parties); 6A A. Corbin, <u>Contracts</u>

§ 249 (1952) (function of escrow is to give security to parties to a transaction).

## II.    CRP/EXTELL IS LIKELY TO SUCCEED ON THE MERITS

CRP/Extell alleges that (1) it did not receive due process of law under the regulations;

(2) the Attorney General exceeded the authority of the statute authorizing the Office to

implement regulations in this area; (3) the determinations are affected by errors of law, and are

otherwise arbitrary and capricious, and therefore warrant reversal under Article 78 of the New

York Civil Practice Law and Rules; (4) CRP/Extell is entitled to reformation of the Offering Plan

to reflect the parties' actual intent thereunder; and (5) motivated as they were, the Purchasers breached their obligations of good faith and fair dealing under the Purchase Agreements. CRP/Extell demonstrates below that it is likely to succeed on the merits of each of those claims.

### A.       CRP/Extell Did Not Receive Due Process of Law.

Under each of the following standards, the regulations here have failed to afford CRP/Extell due process of law under the Fourteenth Amendment of the U.S. Constitution.

### 1.       The Supreme Court's Balancing Test.

With respect to the regulations or procedures employed by administrative agencies, the Supreme Court set out the following factors in Matthews v. Eldridge, 424 U.S. 319 (1976). "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 334.[3]

### a.       Significant Private Interests.

The Attorney General's authority to make determinations such as those at issue here affects significant private interests.  In absolute terms, the amounts of money paid in the escrow accounts under the regulations may be millions of dollars.  In addition, in relative terms, such monies may constitute a significant percentage of a purchaser's liquid assets, and, particularly in

---

[3]       The foregoing constitutional law applies even if the New York State Administrative Procedure Act ("SAPA") does not govern the Attorney General's determinations.  The SAPA applies to proceedings for which the law requires the agency to make a factual record.  SAPA §§ 301, 102(3).  Section 352 does not require the Attorney General to make any such record with respect to its determinations.  The requirements of the SAPA, however, are not coterminous with the due process requirements of the Constitution.  See, e.g., Vector E. Realty Corp. v. Abrams, 89 A.D.2d 453, 456-67, 455 N.Y.S.2d 773, 775-76 (1st Dep't 1982).

the aggregate, a significant percentage of the money a real-estate developer needs to continue to operate the building at issue.

**b.**        <u>**High Risk of Error.**</u>

Under the regulations, the risk of an erroneous deprivation of the right of a participant in a dispute over down payments is high.  The regulations provide no framework to ensure that in making "determinations" to resolve "disputes" concerning such escrow funds, the Attorney General will follow any particular process nor apply any particular considerations.  The regulations provide:  "In the event of a dispute, the sponsors shall apply and the purchaser or the escrow agent holding the down payments in escrow may apply to the Attorney General for a determination on the disposition of the down payment and any interest earned thereon."  13 N.Y.C.R.R. § 20.3(o)(3)(viii)(a).  The regulations say nothing about the nature of such a "determination," about any procedure the Attorney General will apply, about what submissions the participants can make or the Office will consider, about the nature of any evidence the Office may consider, or about the criteria the Office may apply in making the determination.

Where the parties' intent under a purchase agreement should resolve the question of whether purchasers will be entitled to rescind the agreement and how the escrow funds should be released, the regulations provide no assurance that the Attorney General can or will resolve the dispute based on the parties' intent, rather than based on other factors or standards that cannot be ascertained from the regulations.  The regulations also lack any reasonable basis for <u>permitting</u> purchasers to go to court to litigate their disputes with sponsors concerning escrowed down payments, but <u>requiring</u> sponsors to present such disputes to the Attorney General.  Similarly, the regulations provide no guidance or limitation as to whether the Attorney General will exercise the discretion that the Office regards itself as having with respect to whether to resolve such a dispute itself or have the parties proceed to court if they want to have the dispute resolved.

24

### c.    <u>High Probable Value of Some Safeguards.</u>

The probable value of regulations that provide at least some framework, guidance, and limitation on the Attorney General's unbridled discretion to resolve such disputes is high.  If the regulations required, in certain instances, the Attorney General either to take discovery or permit the parties to take discovery, or even inform the parties in any way of the extent to which the Office may determine to consider any particular type of evidence in making its determinations, then the regulations would be much more likely to lead the Attorney General to resolve the question consistent with the appropriate standard.

Similarly, if the regulations were to treat purchasers and sponsors equally and give them both the option of going to court to resolve a dispute concerning escrowed down payments, rather than permitting only purchasers to go to court to litigate such disputes and requiring sponsors to submit such disputes to the Attorney General, then the regulations would not draw an unreasoned distinction that unfairly deprives one group of parties of its ability to go to court (and thus obtain discovery) in the first instance if it so chooses.  By drawing such an unreasoned distinction, the regulations give purchasers control over whether sponsors like CRP/Extell can take discovery to support their positions and what arguments the parties will be able to make in support of their respective positions.

### d.    <u>Minimal Fiscal or Administrative Burdens.</u>

The fiscal and administrative burdens that such regulations would entail for the Attorney General are small.  In most disputes, the purchase agreement at issue does not contain a material scrivener's error.  In the instances where the Attorney General does need extrinsic evidence to determine the parties' intent and decide the claims in accordance with the operative legal standards, moreover, the discovery the parties take of each other should be an adequate substitute for any discovery the Office is authorized to take itself through subpoenas.  In permitting the

parties to the dispute to take discovery of each other, the Attorney General assumes virtually no fiscal or administrative burden at all.

The frequency and volume of subpoenas and depositions the Attorney General might itself issue and take are not significant burdens, in particular relative to the scope of the Office's obligations.  And in the event that there was a fiscal or administrative burden that would result from such discovery where appropriate, the Attorney General could decline to resolve the dispute and permit the parties to have the dispute resolved in court.

2.    **Specific Constitutional Standards Governing Agencies.**

In addition to the foregoing balancing test, the courts have set forth specific constitutional standards governing agencies.

a.    **Ascertainable Standards.**

It has long been the law that agency regulations must set forth "ascertainable" standards with respect to what factors the agency will consider in making its decision – that the regulations provide fair warning of the criteria by which a given determination will be made.  Holmes v. N.Y. City Hous. Auth., 398 F.2d 262, 265 (2d Cir. 1968).  Where regulations provide an agency with unbridled discretion to resolve the issues that come before it, they provide inadequate constitutional safeguards.  Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969).  Where the subject matter of the issues presented before an agency is not one "so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule," the subject matter does not compel "individual, ad hoc litigation" in lieu of standards governing the agency's discretion.  SEC v. Chenery Corp., 442 U.S. 194, 202-03 (1947).

The regulations here say nothing about the nature of the "determination" the Attorney General may undertake to make; about any procedure the Office will apply; about what submissions the participants can make or the Office will consider; about the nature of any

evidence the Office may consider; or about the criteria the Office may apply in resolving the determination.  The regulations provide none of the guidance that the courts have long required agencies to provide.

> **b.**     **Adjudicative Determinations.**

The Supreme Court has long held that "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have been traditionally associated with the judicial process."  Hannah v. Larche, 363 U.S. 420, 442 (1960).  In applying the Due Process Clause, the federal courts are thus careful to distinguish between investigative agency proceedings and those in which the agency makes such "binding determinations which directly affect the legal rights of individuals."  RNR Enters., Inc. v. SEC, 122 F.3d 93, 98 (2d Cir. 1997); accord Utica Packing Co. v. Block, 781 F.2d 71, 78 (6th Cir. 1986); N.Y. Civil Liberties Union v. N.Y. City Transit Auth., 675 F. Supp. 2d 411, 433 n.29 (S.D.N.Y. 2009); Cooper v. Salazar, No. 98C 2930, 2001 WL 1351121, at *4 (N.D. Ill. Nov. 1, 2001).

In interpreting Section 352-e, moreover, the New York courts have long held that it is only with respect to those provisions of the statute under which the Attorney General is not "empowered to make binding factual determinations of a judicial nature" that the use of process associated with the judicial process is unnecessary.  160 W. 87th St. Corp. v. Lefkowitz, 76 Misc. 2d 297, 300-01, 350 N.Y.S.2d 957, 961-62 (Sup. Ct. N.Y. County 1973).  The Attorney General's general authority under Section 352 is "purely administrative," and the "essence of Section 352-e is to compel publication of all the applicable facts so that investors and purchasers of interests in real estate will have the facts fully and fairly set before them."  Id. at 300-01, 350 N.Y.S.2d at 962.  With respect to the Attorney General's invocation of those aspects of those

statutes, it therefore makes sense to afford few procedural protections.  Id. at 301-02, 350 N.Y.S.2d at 962-63.  In contrast, where the Attorney General is doing more than "conducting a preliminary investigation," where the Office is making a "factual determination" that is "final and binding," it follows that the fuller scope of procedural protections are constitutionally required.  Id. at 300-02, 350 N.Y.S.2d at 961-63.

The regulations do not require the Attorney General to employ any such procedures.  In particular, they do not require the Attorney General either to take any discovery, to permit the parties to take any discovery, or even to inform the parties in any way of the extent to which the Office may determine to consider any particular type of evidence in making its determination.  In sum, they provide no requirement that the Attorney General ever take any of the foregoing judicial-type procedures, let alone all of them.

### c.    Discovery for Adjudicative Determinations.

An agency must always endeavor to mold its procedures to the requirements of due process.  Withrow v. Larkin, 421 U.S. 35, 46 (1975).  Where discovery is among "the procedures which have been traditionally associated with the judicial process," Hannah, 363 U.S. at 442, in an administrative proceeding, "discovery must be granted if in the particular situation a refusal to do so would so prejudice a party as to deny him due process."  Mister Discount Stockbrokers, Inc. v. SEC, 768 F.2d 875, 878 (7th Cir. 1985); accord McClelland v. Andrus, 606 F.2d 1278, 1286 (D.C. Cir. 1979); Hous. Auth. of County of King v. Pierce, 711 F. Supp. 19, 22 (D.D.C. 1989); see also State v. Smith, 482 S.E.2d 124, 129 (W.V. 1997) (holding that "an administrative agency must grant discovery to a party in a contested case regardless of whether the enabling statute or agency rules provide for it, if refusal to grant discovery would so prejudice the party as to amount to a denial of due process").

Similarly, in their interpretation of the requirements of due process, the courts in New York agree that the "opportunity to be heard" provided under the GBL "requires at least the right to confirm the existence of evidence which would support a determination" the state agency may make, as well as "the right to examine that evidence and a meaningful opportunity to refute it." Matter of E. 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129, 1131, 458 N.Y.S.2d 953, 956 (3d Dep't 1983); accord Tonovic v. Abrams, 124 Misc. 2d 407, 412, 478 N.Y.S.2d 225, 229 (Sup. Ct. N.Y. County 1983); see, e.g., Lee Myles Assocs. v. Abrams, 117 Misc. 2d 919, 923-24, 455 N.Y.S.2d 983, 986 (Sup. Ct. N.Y. County 1982) (with respect to Attorney General's determination to deny plaintiff's franchise registration application, under the Office's "statutory power," plaintiff was not afforded a "procedural due process rights" to "subpoena witnesses").

### 3.    The Determinations Under the Regulations.

In light of the foregoing standards, CRP/Extell did not receive due process of law.  The Attorney General failed to permit CRP/Extell to ask questions and collect extrinsic evidence of third parties or permit CRP/Extell to request that the Office obtain such extrinsic evidence through the employment of its subpoena power.  Where the Attorney General ended up focusing on the lack of such evidence, and where such evidence clearly is relevant under the New York law of contracts that the Office reviewed, the Office's omissions deprived CRP/Extell of due process of law.

CRP/Extell reasonably expects that several related types of extrinsic evidence would help to illuminate the parties' intent under the Offering Plan and show it to be contrary to the determinations.  Such evidence includes the evidence of the intent of CRP/Extell (and the counsel who drafted the Offering Plan), the evidence of the purchasers' intent, the evidence of the relevant custom and practice in this industry, and the evidence of the conditions in the

relevant real-estate market as of the date of the Offering Plan.  (Complaint ¶¶ 103-04; Genack Decl. ¶¶ 22-31.)

The extrinsic evidence of CRP/Extell's intent would confirm what the language of the Offering Plan as a whole makes clear – namely, that CRP/Extell did not intend to provide purchasers a money-back guarantee that the first closing would occur by September 1, 2008, but rather did intend to preserve for itself the legal cushion of avoiding unfavorable contractual rescissions in the altogether likely event that the first closing did not occur by the exact date of the projected first closing, September 1, 2008.  (Complaint ¶ 105; Genack Decl. ¶¶ 22-31.)

CRP/Extell reasonably expects that the testimony of the attorneys responsible for drafting the Offering Plan would so confirm.  The testimony of the Purchasers should also confirm that they did not intend to secure for themselves the immediate right to rescind if the first closing did not occur by the exact date of the projected first closing, September 1, 2008, and did not even reasonably expect that such a result could unfold.  The fact that no Purchaser even inquired about any rescission right for many months after September 1, 2008, shows that they did not regard that date as a key one.  (Complaint ¶¶ 106-07; Genack Decl. ¶¶ 24-25.)

The evidence of custom and practice in this industry, in turn, would buttress the foregoing, direct extrinsic evidence of the parties' intent.  Such evidence is relevant extrinsic evidence under the New York law of contracts.  Such evidence here would show that in applying the requirement that Purchasers be afforded a right of rescission if the first closing is delayed by more than twelve months past the projected date for such first closing, sponsors like CRP/Extell customarily give themselves the full year in which to achieve the first closing, and guarantee that date because they are required to do so by regulation.  Just as importantly, the evidence would show that sponsors do not give purchasers an immediate right of rescission if the first closing has

not occurred by the exact projected date of the first closing, particularly where the Offering Plan repeatedly states that the Sponsor cannot guarantee and is not guaranteeing that the first closing will occur on the projected date.  (Complaint ¶¶ 108-10; Genack Decl. ¶¶ 26-28.)

A further piece of critical extrinsic evidence that the Attorney General erred in failing to consider was the actual evidence of the conditions of the real-estate market at the time of the Offering Plan.  Trying to square the Determinations with the obvious question of whether the reading of the provision with the typographical error could make any commercial sense, the Attorney General reasoned (at 12-13) that in a "highly competitive market" – by implication, one in which sponsors had to provide relatively more incentives to induce purchasers to buy units – it could make sense for a sponsor to give purchasers an immediate right of rescission if the first closing had not occurred by the estimate date of first closing.  That analysis begged the question of whether the market was "highly competitive" at the time of the Offering Plan.  It was not.  In 2006, when the Offering Plan was drafted, there was robust demand in New York City for real estate in general, and CRP/Extell can present evidence to confirm those facts.  (Complaint ¶¶ 111-13; Genack Decl. ¶¶ 29-30.)

The Attorney General also could not explain away the significance of CRP/Extell's marketing materials concerning the building.  In those materials, advertised in 2006 and 2007, CRP/Extell stated that it expected units to open in "Winter 2008" – that is, December 2008. Those materials are thus inconsistent with any suggestion that CRP/Extell intentionally was trying to induce purchasers to purchase units in The Rushmore by offering them a unique money-back guarantee that the first closing in the building would occur by September 1, 2008 – months prior to the time it actually advertised in its marketing materials.  Indeed, even in one of their primary submissions to the Attorney General, the Purchasers alleged that CRP/Extell's

31

sales office had "repeatedly" told them that the building would be ready for occupancy by the "fall of 2008" – which, even bending over backwards to construe in favor of the Purchasers – could not actually mean September 1, 2008.  (Complaint ¶¶ 114-16.)  There is good reason for dubiety over the Purchasers' citation to such allegations, moreover, where no Purchaser has alleged that it even raised with CRP/Extell the issue of the first closing date for many months after September 1, 2008.

### B.        The Determinations Exceeded the Attorney General's Statutory Authority.

Article III, Section 1 of the New York Constitution precludes a state agency from acting in excess of the statutory authority that the agency is authorized to implement.  <u>Council for Owner Occupied Hous., Inc. v. Abrams</u>, 72 N.Y.2d 553, 558, 531 N.E.2d 627, 631 (1988); <u>see also</u> <u>Boreali v. Axelrod</u>, 71 N.Y.2d 1, 10-15, 517 N.E.2d 1350, 1360-65 (1987).  As the lower court in <u>Owner Occupied Housing</u> held, when an agency implements and relies on regulations that exceed the authority of the enabling statute, the agency's conduct is "tantamount to an usurpation of the Legislative function."  <u>Council for Owner Occupied Hous., Inc. v. Abrams</u>, 133 Misc. 2d 574, 579, 506 N.Y.S.2d 1014, 1018 (Sup. Ct. Albany County 1986) (finding that Section 352-e "in no way authorizes the Attorney-General to require a sponsor to provide for the correction of building defects, hazards or deficiencies as a part of the offering plan").  The Attorney General, in short, cannot "extend the statutory language to situations not intended to be embraced by the Legislature."  <u>Owner Occupied Housing</u>, 72 N.Y.2d at 558, 531 N.E.2d at 632.

Section 352-e authorizes the Attorney General "to adopt promulgate, amend and rescind suitable rules and regulations to carry out the provisions" of the Section, "including . . . determining when escrow funds may be released, the nature of escrowees, and other terms and conditions relating thereto deemed necessary in the public interest."  The regulations the Attorney General has promulgated pursuant to the foregoing statute provide only that in the

event a dispute arises regarding a down payment in escrow, the sponsors shall apply and the purchaser or escrow agent may apply to the Attorney General for a "determination" regarding the dispute.  13 N.Y.C.R.R. § 20.3(o)(3)(viii)(a).  The regulations, as noted, say nothing further about the nature of such a "determination."

Section 352-e thus does authorize the Attorney General to implement regulations pursuant to which the Office can resolve disputes concerning the foregoing down payments in escrow.  Yet the regulations the Attorney General came to promulgate permit the Office to resolve disputes concerning escrow down payments on any grounds the Office may determine to be appropriate, including based on considerations other than the law of contracts that pertain to the purchase agreements governing those payments.  In failing to set forth any parameters at all over the grounds on which the Attorney General is authorized to resolve disputes concerning escrow accounts, the regulations do not qualify as "suitable" under Section 352-e.  The regulations therefore permit the Attorney General to act in excess of the statute that the office is authorized to implement – namely, Section 352-e.

The Attorney General's Determinations illustrate this fundamental problem. Notwithstanding the Attorney General's gestures toward interpreting the Offering Plan and citing New York law to do so, the Determinations turn on policy-based considerations that underscore that the regulations improperly permit the Office to act in excess of the statute that it is authorized to implement.  The Attorney General did so in at least three related respects, as set forth below.

### 1.    The "Message" the Attorney General Decided to Send.

The Attorney General expressly based its conclusion on what "message" should or should not be sent about the disclosures in sponsor's offering plans.  Seeking to distinguish one case,

and then setting forth the culmination of its analysis of "Scrivener's Error, Mistake and

Reformation," the Attorney General stated:

> Here, by contrast, no document has been presented that contradicts
> the Offering Plan or provides a different rescission date.  Nor has
> Sponsor presented any evidence of any other communications or
> representations that would have put purchasers, who signed
> agreements months, and in many cases, over a year before
> September 1, 2008, on notice that Sponsor meant 2009 when it
> wrote 2008 in the Offering Plan.  To allow Sponsor in these
> circumstances to change the Offering Plan and apply it
> retroactively would send the wrong message about the importance
> of statements made by sponsors in offering plans.

(Determinations at 8-9.)  This statement reveals the policy-based linchpin of the Attorney

General's analysis – that if the Office were to interpret an agreement to provide for a rescission

date other than the date typed into the agreement, even where required to do so by the rules of

contract interpretation, then the Office would be sending the "wrong message."  The right

"message" appears to be that the plain language in offering plans is important and that

purchasers are entitled to rely on it.

Under the rules of contract interpretation, however, such considerations are not the final

analysis; they are, as shown above, the baseline rules for which the law makes express and well-

established exceptions in considering "Scrivener's Error, Mistake and Reformation."  The literal

import of the Attorney General's reasoning is that regardless of the actual intent or understanding

of the purchasers, unless the sponsor had made "communications" or "representations" to the

purchasers that a date different from the one typed in the agreement was the intended rescission

date, then the typed date must control.  That is not the law.  It is simply the rule the Attorney

General decided to apply.

Indeed, with respect to Section 352-e in particular, the New York Court of Appeals has

explained that "section 352-e is not, in any sense, an omnibus enforcement statute.  As its

language and our decisions make clear, it is a disclosure statute, designed to protect the public from fraudulent exploitation in the sale of real estate securities."  <u>Owner Occupied Hous.</u>, 72 N.Y.2d at 557, 531 N.E.2d at 631.  The statute is oriented around protecting the public from "fraudulent" conduct.  In the absence of any finding that Extell's Offering Plan was in any way "fraudulent," the statute does not authorize the Attorney General to determine that any particular "message" should be sent to the public regarding the language used in the Offering Plan.

**2.      The Hypothetical Real-Estate Market.**

Later in its Determinations, the Attorney General adopted a further standard that is apparently designed to protect and benefit purchasers, but that finds no support in the law of contract interpretation.  Confirming that its conclusions did not turn on its view of what the parties actually intended, and then expanding on the point, the Attorney General stated:

> As noted, the Attorney General will not rewrite an Offering Plan because Sponsor now contends that its Offering Plan – whether intentionally or not – was more generous to purchasers than the law requires.  It is entirely conceivable that a seller in a highly competitive marketplace might offer an opportunity for purchasers to get their deposit money back shortly after the projected First Closing date rather than have their funds remain in escrow for an additional twelve (12) months.  Such an offer could be a powerful inducement to prospective purchasers.  There is nothing inherently unreasonable, let alone absurd or illegal as Sponsor suggests, in making such an offer.

(Determinations at 12-13.)  This line of reasoning thus sets forth the proposition that in resolving an escrow dispute based on the language of a contract, the Attorney General may put aside both what the parties to the contract in fact intended and the facts of the real world, and instead ask whether there is a "conceivable" world in which the contract language "could" be reasonable.  Extell submits that no such proposition can govern here.

The Attorney General's analysis also does not do justice to Extell's argument below.  Where the sponsor controls the drafting of the offering plans and subsequent agreements, and

35

where the sponsor is obligated to provide for the purchaser's right of rescission if the date of first

closing is delayed by one year, and where the sponsor has repeatedly stated in the offering plan

that it makes no guarantee that the first closing would occur by the projected date, it would not

make any sense – commercial or otherwise – for the sponsor then to provide the purchaser with a

money-back guarantee if the first closing did not occur by the projected date.  The Attorney

General's resort to a hypothetical world thus not only failed for the absence of any extrinsic

evidence, as shown above, but also ignored the fundamental point that in such a hypothetical

world, a sponsor would <u>not</u> have repeatedly emphasized its <u>inability</u> and <u>unwillingness</u> to

promise a first closing by the estimate date.

### 3.  <u>The Singular Reliance on the Type-Written Date.</u>

In essentially treating as dispositive the indisputable fact that the Agreement does state

"September 1, 2008" to be the rescission date, the Attorney General elevated the benefits it

sought to achieve for purchasers over the more searching contractual analysis that the law

requires.  The Attorney General framed this approach most clearly when it stated (at 13) that "the

issue is not what the Attorney General might know from his Office's review of numerous

offering plans, but rather what this Sponsor stated in its Offering Plan."  The theme is repeated

throughout the Determinations, where the Attorney General states, as examples, that "the

September 1, 2008 date appears in the Offering Plan prepared by Sponsor and its counsel"

(Determinations at 5); that "September 1, 2008 is the date Sponsor specified in the Offering Plan

(<u>id.</u> at 6); that the "Provision here states a set deadline and a contemporaneous consequence for

Sponsor's failure to meet that deadline" (<u>id.</u> at 9); that the provision "unambiguously states that

if the First Closing does not occur by September 1, 2008, Sponsor will offer rescission" (<u>id.</u> at

12); and that "Sponsor wrote in a specific date on which rescission would be offered, without

qualification" (<u>id.</u> at 15).

Considered together, and notwithstanding the Attorney General's efforts to suggest otherwise by addressing some precedent, the foregoing statements and decisions reflect what was ultimately the Office's policy-based decision to subvert any consideration of the parties' actual intent to a standard of strict liability, binding sponsors to the rescission date typed into the offering plan.  Indeed, the Attorney General's dismissal of what it "might know" from having reviewed other plans undercuts any suggestion that if there had been extrinsic evidence before it, the Office might have reached a different decision.  The Attorney General made clear that it was adopting a policy of holding a sponsor to the rescission date typed into the offering plan.  The Attorney General's approach exemplified how the relevant regulations, which impose absolutely no restrictions on the grounds on which the office makes "determinations," exceed the statute authorizing the office to implement such regulations.

In this additional respect, the New York Court of Appeals' explanation of the scope of Section 352-e is important.  Under that section, "the required offering statement is intended to provide an adequate factual basis upon which potential investors, purchasers and participants can intelligently make their choice and found their judgment to buy or not to buy."  Owner Occupied Hous., 72 N.Y.2d at 557, 531 N.E.2d at 631.  In the absence of any significant evidence that the Purchasers here actually did rely on September 1, 2008, in the Offering Plan as a "factual basis" upon which they actually did "make their choice and found their judgment to buy or not to buy," the Attorney General had no basis for elevating the type-written date to the significance it did.

### C.    The Determinations Should Be Reversed Under Article 78.

Under Article 78, a court must reverse an agency's determination if it "was affected by an error of law or was arbitrary and capricious."  CPLR § 7803(3).  As a general matter, of course, the interpretation of the language of a contract is a classic judicial function, one that does not implicate any agency expertise.  Accordingly, in addition to the well-established "error of law"

standard, such decisions are reviewed de novo.  In <u>Burgin v. Office of Personnel Mgmt.</u>, 120

F.3d 494 (4th Cir. 1997), for example, in considering a decision of the United States Office of

Personnel Management, the court held:

> [A]lthough we would defer to the agency's determination of
> whether a health benefits contract meets regulatory requirements,
> here, the dispute is not to be resolved by reference to the regulatory
> provisions governing the features of an acceptable contract.
> Rather, the essential question is one of the interpretation of the
> contract's language, a question of law clearly within the
> competence of the courts, and which we review *de novo*.

<u>Id.</u> at 497-98 (quotations and citations omitted).  Accordingly, where the reviewing court regards

the agency "interpretation of the contract as violative of norms of contract construction," reversal

of the determination is appropriate.  <u>Id.</u> at 499.  The same principles have long applied in the

New York courts.  <u>See, e.g.</u>, <u>Constr. Mgmt. Corp. v. Brown & Root, Inc.</u>, 41 Misc. 2d 864, 870,

246 N.Y.S.2d 465, 471 (Sup. Ct. N.Y. County 1964) (holding that with respect to administrative

decisions, if "ambiguity is susceptible to interpretation within the four corners of the instrument,

it is purely a question of law").

**1.      The Attorney General Committed Errors of Law in**
<u>**Failing to Collect and Consider Extrinsic Evidence.**</u>

The Attorney General failed to issue any subpoenas to collect any extrinsic evidence and

failed to afford CRP/Extell any opportunity to obtain extrinsic evidence from third parties or the

Purchasers.  In its Determinations, moreover, in a mere footnote, the Attorney General concluded

that an integration clause in a contract "might" foreclose consideration of parol evidence in

analyzing a claim of scrivener's error, mistake, and reformation:  "The Attorney General notes

that the integration clause, quoted in paragraph 4 above, might foreclose reference to parol

evidence, though the issue need not be reached because no parol evidence on the subject has

been presented."  (Determinations at 6 n.1.)  The Attorney General erred as a matter of law in

38

failing to recognize the central relevance of extrinsic evidence, and in concluding that parol evidence might not be admissible.  The very issues presented warranted the consideration of extrinsic evidence – namely, reformation due to scrivener's error or mutual mistake, and clarification of an ambiguous contract.

**a.      Reformation for Mistake or Scrivener's Error.**

Where reformation of a contract is at issue, as in the case of an asserted scrivener's error or mistake, the rules against consideration of extrinsic or parol evidence do not apply.  Instead, the fact-finder should consider such evidence in determining the parties' intent and the extent to which the terms of the contract reflect that intent.

"Because the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties, generally neither the parol evidence rule nor the Statute of Frauds applies to bar proof, in the form of parol or extrinsic evidence, of the claimed agreement." Chimart Assocs. v. Paul, 66 N.Y.2d 570, 573, 489 N.E.2d 231, 234, 498 N.Y.S.2d 344, 347 (1986); accord The U.S. Russian Inv. Fund v. Neal & Co., No. 97 Civ. 1788 (DC), 1998 WL 557606, at *5 (S.D.N.Y. Sept. 2, 1998); see also D.B. Zwirn Special Opportunity Fund v. Squire, 164 Fed. Appx. 175, 176 (2d Cir. 2006); Investors Ins. Co. of Am. v. Dorinco Reinsurance Co., 917 F.2d 100, 105 (2d Cir. 1990); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am., No. 04CIV10014PKL, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005).

Instead, the fact-finder must consider such evidence in determining the parties' intent and the extent to which the terms of the contract reflect that intent.  See, e.g., Pitcher v. Hennessey, 48 N.Y. 415, 423 (1872) ("In such a case equity will conform the written instrument to the parol agreement which it was intended to embody.").  A clear and unambiguous contract does not trump evidence of the parties' actual intent as that would essentially defeat the argument for

39

reformation.  See, e.g., Hart v. Blabey, 287 N.Y. 257, 262 (1942); Meier v. Brooks, 22 A.D.2d 56, 59, 253 N.Y.S.2d 564, 568 (4th Dep't 1964).

These principles reflect very well-established law.  "Where there is no mistake about the agreement, and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected."  Born v. Schrenkeisen, 110 N.Y. 55, 59, 17 N.E. 339, 341 (1888).  A scrivener's error thus will provide a basis for reformation even though the fault in drafting lies with only one of the parties, and even if there is negligent failure to read the agreement before signing it.  Id.; see, e.g., In re Schick, 232 B.R. 589, 598-99 (S.D.N.Y. 1999) (collecting cases).

Indeed, the established law in New York is that evidence of extrinsic factors, including the environment and motive of the parties, is critical when deciding a reformation claim:

> If the environment and the motive of the parties, the consideration and the necessities to be met, make the contract as it is written a highly improbable one, one for which there was no motive, or necessity, or consideration, then the writing has little self-supporting force, and a relatively small amount of clear and credible evidence will establish the mistake.

Meier, 22 A.D.2d at 60, 253 N.Y.S.2d at 568; see also Gonzalez v. Strand Condos., No. 105863/04, 2007 WL 4336411, at *3 (N.Y. Sup. Ct. Nov. 13, 2007) (considering testimony of drafter and prior contracts of drafter in allowing complaint to be amended to include reformation claim); Schick, 232 B.R. at 599 (finding evidentiary hearing required to resolve reformation claim); Mercer Capital Ltd. v. U.S. Dry Cleaning Corp., No. 08 Civ. 05763, 2009 WL 2163598, at *7 (S.D.N.Y. July 21, 2009) (denying motion to dismiss reformation claim where extrinsic evidence must be considered to evaluate merits).

In Meier, for example, the landlord leased premises to his tenant for a five-year term with the option to renew for additional five-year terms upon written notice.  22 A.D.2d at 57, 253

N.Y.S.2d at 566.  The landlord consented to two renewals, but objected to the third, upon which the tenant refused to leave and the landlord sued to reform the lease.  Id.  The landlord established the parties' intent that the lease would not be renewed beyond three renewal periods by producing the attorney who drafted the lease, who testified that he may have incorrectly added an "s" to the word "term."  Id. at 58, 253 N.Y.S.2d at 567.  The court favored the testimony of the drafter, found the testimony of defendant and his friend lacked credibility, and reversed the judgment, dismissing the complaint and ordering that the lease be reformed to reflect the parties' intent.  Id. at 61, 253 N.Y.S.2d at 568.

The Second Circuit has approached the issue in the same way.  In Prudential Insurance Co. of America v. S.S. American Lancer, 870 F.2d 867 (2d Cir. 1989), for example, the court corrected a $92 million typographical error to prevent a benefit that was not bargained for.  Id. at 871.  The court held that a first preferred ship mortgage was valid for the amount that the mortgagee and debtor originally intended, rather than the amount erroneously recorded on the mortgage amendment.  Id. at 871.  The court reasoned that correcting the clerical error would mean that the subordinate debt holder would lose nothing to which it was entitled or expected to gain from the freely negotiated transaction, but if the error remained, the subordinate debt holder would be the beneficiary of a major windfall, "and equity, we believe, abhors a windfall."  Id.

The Attorney General's approach to the question of extrinsic evidence, and its treatment of the issue in its Determinations, contain legal errors by failing to account for this controlling law.  The fundamental legal error in the Attorney General's analysis was that it was obligated to consider, and thus either collect itself or permit the parties to collect from each other, all of the relevant extrinsic evidence in order to determine whether there was a scrivener's error or mutual

mistake.  See In re Schick, 232 B.R. at 599; Meier, 22 A.D.2d at 60; Schneider v. Swartele, 239 A.D. 329, 331 (4th Dep't 1933).

In its efforts to address and distinguish certain case law, moreover, the Attorney General either failed to address controlling precedent or else compounded its foregoing errors by distinguishing cases based on the absence of similar extrinsic evidence – which the Office had made no effort to collect itself, which the Office did not permit CRP/Extell to obtain from Purchasers or third parties, and which CRP/Extell reasonably understood was not to be any significant focus of the Office's consideration.  The Attorney General also sought to distinguish such precedent on the grounds that the contracts at issue did not contain the exact same type of inconsistencies as the Offering Plan, which is not the governing standard.  The question is whether there are provisions in the Offering Plan that are inconsistent with September 1, 2008, as the rescission date.  There are.  (Complaint ¶¶ 116-123; Part II.C.2, below.)

### b.        Conflicting and Ambiguous Contractual Provisions.

Where the provisions of a contract are conflicting and difficult to reconcile, or where the language of the contract otherwise is ambiguous, the extrinsic evidence of the parties' intent is relevant.  JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (citing cases). Accordingly, in such instances, a lower court's failure to consider extrinsic evidence is reversible error.  See, e.g., ISC Holding AG v. Nobel Biocare Invs. N.V., 351 Fed. Appx. 480, 482 (2d Cir. 2009); Scott-Macon Secs., Inc. v. Zoltek Cos., No. 06-2711-cv, 2007 WL 2914873, at *4 (2d Cir. Oct. 4, 2007); Collins v. Harrison-Bode, 303 F.3d 429, 433-34 (2d Cir. 2002); Albany Sav. Bank, FSB v. Halpin, 117 F.3d 669, 673-74 (2d Cir. 1997); Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428-29 (2d Cir. 1992).

The provisions of the Offering Plan, as shown just below, are conflicting and difficult to reconcile.  (Complaint ¶¶ 116-123; Part II.C.2, below.)  Accordingly, in order to determine the

parties' intent, the Attorney General was obligated to consider all of the reasonably available extrinsic evidence of the parties' intent.  The failure to do so was an error of law.

> **2.     The Attorney General Committed Errors of Law in Its Interpretation of the Terms of the Offering Plan.**

The Attorney General decided that read in its entirety, the Offering Plan contains no ambiguity on the question of whether the parties intended for the purchasers to have a money-back guarantee that the first closing would occur by September 1, 2008.  In addition to the fact that extrinsic evidence is admissible on CRP/Extell's assertion of scrivener's error, the Plan cannot be reasonably read to reflect the parties' intent that the purchasers had such a guarantee.

The provisions of a contract are unambiguous only if they have "a definite and precise meaning," "concerning which there is no reasonable basis for a difference of opinion."  JA Apparel, 568 F.3d at 396 (citations and quotations omitted).  "Ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Id. (citations and quotations omitted).

There are multiple provisions of the Offering Plan in which CRP/Extell took great care to make clear that it could not and would not guarantee that the first closing would occur by September 1, 2008.  The Offering Plan contains a provision, for example, allowing for rescission if the first closing is delayed by six months from the projected date of first closing only if the projected budget increases by 25% or more.  Such a conditional right to rescind is difficult (if not impossible) to reconcile with reading the Offering Plan to mean that the Purchasers already had an unconditional right to rescind if CRP/Extell missed the projected first closing date by a single day.  Such a reading thus reflects, at a minimum, ambiguity on the issue of the parties' intent.

In point of fact, moreover, if the unconditional rescission date in the Offering Plan is supposedly September 1, 2008, then the foregoing rescission provision creates a much more fundamental contradiction than the Attorney General was willing to acknowledge.  Under the Attorney General's reading, the Offering Plan first gives purchasers the <u>unconditional</u> right to rescind their Purchase Agreements if the first closing of title on a unit had not occurred by September 1, 2008; and then gives purchasers only a <u>conditional</u> right to rescind their Purchase Agreements six months later, if the building is 25% over budget.  That reading makes no sense at all.  The only commercially reasonable way for the Offering Plan to operate is for it first to give purchasers the conditional right to rescind (if the building is 25% over budget), and thereafter – if things were delayed even more, such that title has not closed on the first unit within even a year of the estimated date – to give purchasers an unconditional right to rescind.  Indeed, that is exactly the progression set forth in the very regulations that require sponsors to set forth such dates, on such timetables, in their offering plans.

The Offering Plan contains several other statements entirely inconsistent with any money-back guarantee that the first closing would occur by September 1, 2008, such as:

- The "First Closing may occur sooner or later than the projected first year of condominium operation."

-  "Sponsor does not . . . warrant or guarantee the foregoing completion or occupancy dates for the Building due to Unavoidable Delays."

- "Sponsor makes no representation regarding the commencement date for the first year of Condominium operation."

-  "No assurance can be given with regard to the accuracy of any projected completion dates set forth herein."

44

If the parties in fact had intended for a money-back guarantee if the first closing did not take place exactly on the projected September 1, 2008, date, these other provisions are flatly inconsistent with that suggestion.  There can be no reasonable dispute on that point.

Indeed, as it turned about, the Attorney General chose to avoid that point – the point about the parties' actual intent.  Instead, the Determinations addressed (at 12-13) the different question of whether in a hypothetical world it might make sense for a sponsor to provide a money-back guarantee that the first closing would occur by the projected date for the first closing.  That is not the same as undertaking to determine what the parties actually intended, and that is not what the law considers in interpreting the binding terms of a contractual agreement.

Even entertaining such a hypothetical world, moreover, the Attorney General's interpretation is not reasonable.  The analysis ignored the fundamental point that in such a world, a sponsor would not have repeatedly emphasized its inability and unwillingness to promise a first closing by the projected date.  There is simply no way of reconciling the entirety of the Offering Plan with a reading of a money-back guarantee for the date of September 1, 2008.

> **3.      The Attorney General Acted Arbitrarily and Capriciously in
> Its Consideration of Some Extrinsic Evidence.**

In addition to the errors inherent in its treatment of prospective extrinsic evidence in general, the Attorney General misapprehended the limited extrinsic evidence it did consider.  The Attorney General did so in several respects:

<u>First</u>, the Attorney General's citation to the initial proposed offering plan does not advance the analysis of the parties' intent.  The Determinations state (at 13 n.4):  "Sponsor's initial proposed offering plan has the same language of the Provision but with a February 1, 2008 date for both the First Closing and the right of rescission."  Absent further extrinsic evidence, however, the citation to the initial proposed offering plan accomplishes nothing more than

45

identifying the original source of the mistake.  It is at least as reasonable to conclude from the initial proposed offering plan, in other words, that the mistakenly matched dates of "February 1, 2008" were both changed to "September 1, 2008," preserving the initial mistake.

Second, the Attorney General's brief analysis of the offering plan for another condominium (the Avery Condominium), which Purchasers submitted to the Office just days before the Determinations, is conspicuously incomplete.  The Attorney General reasoned (at 13 n.4) that in that offering plan, "the sponsor specified a rescission date six months after the projected first closing date, which undermines Sponsor's contention here that no sponsor would ever choose a rescission date earlier than the 12-month period permitted in the Regulation."

As an initial matter, the rescission date in the offering plan for the Avery Condominium is support for the proposition, also part of CRP/Extell's arguments, that no sponsor would ever choose a rescission date that is the exact same as the projected date of the first closing, especially in an offering plan in which the sponsor repeatedly emphasizes its inability to guarantee an actual closing by the projected date of the first closing.  The Attorney General acknowledged, moreover, that Extell regards the six-month period in that offering plan as a mistake, a point that the Office had to admit (also at 13 n.4) is "a matter not free from doubt."  In nevertheless treating the language in that offering plan as extrinsic evidence that supported its analysis, rather than considering the full scope of such evidence or even acknowledging the inferences to be drawn in Extell's favor, the Attorney General committed legal error.  The Attorney General's reliance on its interpretation of the Avery offering plan was particularly egregious because CRP/Extell was not given an adequate opportunity to set forth their position regarding that plan or even point out the foregoing absurdity that would result from Purchasers' interpretation of that plan.  In addition, the probative value of the Avery Condominium offering plan must reasonably turn on

46

the volume of other offering plans, and how they treat the issue of the rescission date.
CRP/Extell has many plans, and sponsors across the City have hundreds of such plans, that
contain a rescission date a full year after the projected date of first closing, mirroring the
requirement of the regulations and confirming the practice.  (Genack Decl. ¶¶ 26-28.)

The Attorney General's decision to resolve the foregoing question against Extell without
any evidence that the Avery offering plan did not contain an error was arbitrary and capricious.
Indeed, the Avery offering plan contains the same conditional right to rescission as the Offering
Plan for The Rushmore.  By interpreting the Avery offering plan to mean that purchasers were
given the right to rescind their agreements if the first closing did not take place within six months
of the projected first closing date, rather than within twelve months of that date, the Attorney
General thus ignored and rendered meaningless the separate, express provision of the Avery
offering plan that provided purchasers with the right to rescind if the first closing was delayed by
the same amount of time (six months) only if the budget changed by 25% or more.  The Attorney
General's reading of the Avery offering plan means that the plan offers a redundant
unconditional right of rescission in the very same circumstance where there is an express
conditional right of rescission.  That is not a remotely reasonable reading of the plan.
(Complaint ¶ 130.)

Third, in basing a critical aspect of its analysis on a hypothetical "highly competitive
marketplace," the Attorney General failed to appreciate how actual extrinsic evidence on that
point would have informed the analysis.  The Attorney General reasoned (at 12):  "It is entirely
conceivable that a seller in a highly competitive marketplace might offer an opportunity for
purchasers to get their deposit money back shortly after the projected First Closing date rather
than have their funds remain in escrow for an additional twelve (12) months.  Such an offer

could be a powerful inducement to prospective purchasers."  For purposes of determining the

<u>actual</u> intent of the parties, however, this reasoning simply begs the question.  That is, where the

Agreement was <u>not</u> executed in a "highly competitive marketplace," then it would <u>not</u> be logical

to conclude that either party intended for the purchasers to be able to get their deposit money

back "shortly after the projected First Closing date."  (Genack Decl. ¶¶ 29-30.)  The Attorney

General's analysis in this regard thus further underscored the missed opportunity to use extrinsic

evidence properly.

      <u>Fourth</u>, the Attorney General failed to afford reasonable meaning to the Purchasers'

inaction under the Agreements.  The Determinations state (at 17):  "The date on which individual

purchasers decided to submit applications for determinations is beside the point.  There are

numerous reasons why a party might hesitate before commencing legal proceedings, many of

which have nothing to do with the merits of the claim."  As an initial matter, to describe the

submission of an application as "commencing legal proceedings" overstates the issue.  The fact

is that if a Purchaser believed it had a right of rescission, all it had to do to preserve its alleged

rights was to file a simple application to that effect with the Attorney General.[4]  The persistent

failure of so many Purchasers to do any such things is noteworthy, not insignificant.

      The larger significance of such delay, moreover, is that it reflects the Purchasers' course

of performance under the Agreement.  Such evidence is relevant because it tends to demonstrate

the parties' intent under the agreement at issue.  The purchasers' delay is evidence that they had

<u>not</u> intended to secure for themselves the right to walk away from their Purchase Agreements if

the first closing in the condominium did not take place by the exact projected date of September

1, 2008, because if they had, they would have exercised their right of rescission much sooner

than several months (and in some cases a year or more) after that date, especially considering the

48

downturn in the real estate market that was well underway by that time.  That is not the only inference to draw from their inaction, but it is certainly reasonable.  Such delay is particularly noteworthy, moreover, where on September 24, 2008, CRP/Extell published an amendment to the Offering Plan reiterating that the "actual first year of Condominium operation may be earlier or later" than projected, that CRP/Extell made no guarantees regarding such date, and that if the actual date of first closing of title is delayed by more than six months from the projected date, purchasers will have the right to rescind their agreements only if the budget for condominium operations increases by 25% or more.  Having received that amendment, not a single purchaser responded by claiming that CRP/Extell was obligated to offer a right of rescission.  Indeed, no purchaser even inquired about such a possibility.  (Complaint ¶ 139.)

It was legal error for the Attorney General to describe such inaction as "beside the point"; it went directly <u>to</u> the point – that the purchasers did not have the affirmative intent to secure September 1, 2008, as the rescission date.  In this additional respect, moreover, the Attorney General's logic reflects its ultimate, policy-based view that regardless of the parties' mutual intent, Extell ought to be stuck with the date typed into the Agreement.  (Part II.B, above.)

<u>Fifth</u>, in determining what relief to afford the Purchasers, the Attorney General again far exceeded what the parties could have intended.  Consistent with the requirements of the regulations, any right of rescission to which the Purchasers might have been entitled would have given them only fifteen (15) days from their notice of the missed deadline, to be provided by CRP/Extell, to decide whether to rescind their Purchase Agreements.  In its Determinations, however, the Attorney General eliminated that requirement entirely – giving Purchasers months, if not more, between the time between the receipt of such notice and their exercising the right of rescission that they claimed to have by filing applications with the Attorney General seeking the

return of their down payments.  One fundamental problem with the Determinations therefore is that they permitted the Purchasers to do precisely what the fifteen-day window is designed to prevent them from doing – namely, wait to decide whether to exercise a right of rescission based on unfolding market conditions, how those conditions might affect the market value of the unit at issue, and whether the passage of time was making it less advantageous to the Purchaser to follow through on the promises it had made in its Purchase Agreement.

In addition, the Attorney General acted arbitrarily and capriciously in deeming rights of rescission to have been exercised upon the filing of the applications.  Such a solution does not reflect the requirements of the regulations nor the intent of the parties.  There is no correlation at all between the time a Purchaser filed its application and the time when it received notice that the first closing in a unit had not closed by September 1, 2008.  It is simply arbitrary for the Attorney General to have afforded some Purchasers many months in which to decide whether to exercise their right of rescission.  The only reasonable relief would have been either to have deemed a Purchaser to have exercised its alleged right of rescission only if it had done so within fifteen days of learning of the alleged missed deadline, or to use the date of the Determinations as the triggering date for the fifteen-day window.  To be consistent, moreover, the Attorney General should have concluded that when CRP/Extell amended its Offering Plan in April 2009, changing the estimated date of the first closing to September 1, 2009, to fix the typographical error, that amendment controlled thereafter.

### D.  CRP/Extell Is Entitled to Reformation of the Offering Plan.

Under the relevant precedent, set forth in Part II.C.1.a, above, CRP/Extell is entitled to reformation of the Offering Plan, thus revising the incorporated terms of the Purchase Agreements.  Under that law, where the words used in a contract do not reflect the parties' actual intent thereunder, the court may change the language of the contract to reflect the parties' intent.

50

The Offering Plan here sets forth a right of rescission if the first closing of title does not take place on the exact day of the projected date for such first closing (September 1, 2008) that does not reflect CRP/Extell's intent as the drafter of the Offering Plan and does not reflect the parties' intent under the Purchase Agreements that incorporate the Offering Plan. The evidence will show that the parties actually intended the foregoing date to be September 1, 2009, as required by the operative regulations. (Genack Decl. ¶¶ 22-31; Part I.A, above.) Accordingly, the Court should reform the Offering Plan and Purchase Agreements to reflect the intent of the parties to set forth the foregoing date as September 1, 2009.

E.   **The Purchasers Have Breached the Implied Covenant of Good Faith and Fair Dealing in the Purchase Agreements.**

The Purchasers chose to exercise their asserted discretionary rights of rescission because they were hoping for "the chance to buy in at a lower price" and thus pass off to CRP/Extell the risk that they had assumed in entering into binding contracts to purchase the units prior to the decline in the market. (Complaint ¶ 86; Genack Decl. ¶ 17.) Under New York law, where they possessed such motivation in exercising their asserted right of rescission (and even if the Determinations stand), the Purchasers have violated the implied covenant of good faith and fair dealing inherent in the purchase agreements.

The covenant of good faith and fair dealing is implied in every contract. Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977, 979-80 (1995). Under the covenant, in exercising its discretionary rights under a contract, a party is not permitted to exercise such a right in bad faith or for illegitimate purposes. Id.; Gross v. Empire Healthchoice Assurance, Inc., 16 Misc. 3d 1112(A), 2007 WL 2066390, at *3-4 (Sup. Ct. N.Y. County 2007) (collecting authority). Such bad faith or illegitimate purposes include conduct that was not within the reasonable contemplation of the parties at the time of contracting, that "will

51

have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton, 87 N.Y.2d at 389, 663 N.E.2d at 291, 639 N.Y.S.2d at 979-80.

In this case, at the time of entering into a given purchase agreement, CRP/Extell and the purchaser did not contemplate that the purchaser would have the right to rescind the agreement based on a downturn in the economy and a drop in the value of the real estate.  The right to rescission was essentially grounded in the prospect that the purchaser had acquired a unit in a condominium building that either was over budget or behind schedule, and therefore was not as attractive a building as had been advertised and promoted in the Offering Plan.  That is not at all the scenario that has prompted the Purchasers here to exercise their asserted rights of rescission. (Genack Decl. ¶ 17.)  Accordingly, the Purchasers have exercised that asserted right for improper reasons and motivations, and therefore have breached the implied covenant of good faith and fair dealing in their Purchase Agreements.

## III.   THE BALANCE OF HARDSHIPS FAVORS CRP/EXTELL

The moving party need not establish that the balance of hardships tips in its favor where, as here, it has already demonstrated both a showing of irreparable harm and a likelihood of success on the merits.  Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 33 (2d Cir. 1995); Lichtenberg v. Besicorp Group Inc., 43 F. Supp. 2d 376, 395 (S.D.N.Y. 1995).  In addition, the balance of hardships do favor CRP/Extell.

CRP/Extell faces significant irreparable loss.  If the down payments are released to the Purchasers, (1) the down payments are significantly likely to be dissipated and thus unrecoverable in the first place; (2) even if the funds have not been dissipated, CRP/Extell faces the prospect of the unquantifiable cost of seeking to obtain and recover monetary judgments in the amounts of the down payments in the likely event that CRP/Extell comes to prevail on at least one of its claims; and (3) CRP/Extell also faces the prospect of the unquantifiable loss of

value of units in the building, resulting from Purchasers' decisions not to take possession of the units they had agreed to purchase.  (Genack Decl. ¶¶ 36-43.)  Under the Purchase Agreements, moreover, CRP/Extell contracted for the placement of down payments in escrow precisely to provide security for itself in situations such as this, where the sponsor faces the prospect of dissipation of assets, unrecoverable money judgments, and unquantifiable economic burdens. (Genack Decl. ¶ 42.)

The Purchasers, in contrast, do not have such factors in their favor.  The down payments will be there (as has been the case for at least the last twenty months) for the Purchasers to recover in the unlikely event they are entitled to them following the lawsuit.  Where the likely prospect is that they did not have the right both to walk away from their Purchase Agreements and recover the down payments they agreed to make thereunder as security for CRP/Extell, it would be inequitable to treat the Purchasers as if they had never signed any Purchase Agreement at all (they all did), as if they actually believed the first closing of title on a unit would occur by September 1, 2008 (there is no evidence that any of them had that belief), or as if they have claimed a right of rescission in good faith or for legitimate reasons (the evidence is to the contrary).  Indeed, where their attorney has admitted on behalf of so many of the Purchasers that their goal in claiming a right of rescission was to negotiate better deals for themselves, it would be unfair to have the release of the down payments further their realization of such an illegitimate purpose, and one that would so clearly constitute a breach of their Purchase Agreements.  (Part II.E, above.)

## CONCLUSION

CRP/Extell respectfully requests, for all of the foregoing reasons, that the Court (1) enter

a temporary restraining order precluding the escrow agent, Stroock & Stroock & Lavan LLP,

from releasing the down payments held in escrow, and precluding the Purchasers from exercising

any right of rescission based on the fact that the first closing of title in the building did not occur

prior to September 1, 2008; and (2) thereafter enter a preliminary injunction to the same effect, to

remain in place until the disposition of the merits of CRP/Extell's claims in this action.

Dated:       May 10, 2010
            Armonk, New York

                                Respectfully submitted,
                                BOIES SCHILLER & FLEXNER LLP

                                By: _____
                                Edward Normand
                                Katherine Eskovitz
                                Jason Cyrulnik
                                333 Main Street
                                Armonk, NY 10504
                                (914) 749-8200
                                *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Edward Normand, hereby certify that a true and correct copy of PLAINTIFF

CRP/EXTELL'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY

RESTRAINING ORDER was served via electronic mail on the 10th day of May, 2010,

and via FedEx on this 11th day of May, 2010, on the following recipients:

Ms. Rosy Mimoun
100 Riverside Boulevard, 3L
New York, NY 10069

Benjamin Goldshlager
2 River Terrace, PH 31F
New York, NY 10282

Howard W. Segal
845 Third Ave, Suite 1740
New York, NY 10022

Richard N. Cohen
Friedberg Cohen Coleman & Pinkas, LLP
767 Third Ave, 31st Floor
New York, NY 10017

Peter L. Herb
225 Broadway, Suite 3504
New York, NY 10007

Derryl Zimmerman
930 East 223rd Street
Bronx, NY 10466

Lawrence C. Weiner
Wilentz Goldman & Spitzer P.A.
90 Woodbridge Center Dr., Suite 900 Box 10
Woodbridge, NJ 07095

James F. Woods
Woods and Lonergan, LLP
292 Madison Ave, 22nd Floor
New York, NY 10017

Bruce H. Schneider
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

Lewis Polishook
Office of the Attorney General of the State of New York
120 Broadway
New York, NY 10271

By:   /s/Edward Normand
      Edward Normand
      Katherine Eskovitz
      Jason Cyrulnik
      BOIES, SCHILLER & FLEXNER LLP
      333 Main Street
      Armonk, NY 10504
      (914) 749-8200
      *Attorneys for Plaintiff*